**FILED**

JUN – 7 2005

**NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT**

Melanie Sloan
D.C. Bar No. 454584
Anne L. Weismann
D.C. Bar No. 298190
Citizens for Responsibility
and Ethics in Washington
11 Dupont Circle, N.W.
2nd Floor
Washington, D.C. 20036
202-588-5565

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND　　　　:
ETHICS IN WASHINGTON　　　　　　　　　:
11 Dupont Circle, N.W.
Washington, D.C. 20036

　　　　Plaintiff,

　　v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES
Independence Avenue, S.W.　　　　　　　:
Washington, D.C. 20201　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　Defendant.　　　　　　　　　　　:

CASE NUMBER  1:05CV01127

JUDGE: Colleen Kollar-Kotelly

DECK TYPE: FOIA/Privacy Act

DATE STAMP: 06/07/2005

## COMPLAINT FOR DECLARATORY
## JUDGMENT AND INJUNCTIVE RELIEF

1.  This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. §552, as

amended, as well as agency FOIA regulations, challenging the failure of the U.S. Department of

Health and Human Services ("HHS") to fulfill the request of Plaintiff for documents relating to

HHS's contracts and contacts with public affairs firms.

2. This case seeks declaratory relief that Defendant is in violation of the FOIA for failing to fulfill Plaintiff's request for records, and injunctive relief that Defendant immediately and fully comply with Plaintiff's request under the FOIA.

## JURISDICTION AND VENUE

3. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. §552(a)(4)(B). This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1331. Venue lies in this district under 5 U.S.C. §552(a)(4)(B).

4. Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW is committed to the protection of the right of citizens to be informed about the activities of government officials and to ensuring the integrity of government officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the governmental decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission.

5. CREW has invested considerable organizational resources in pushing the U.S. government to take ethical issues seriously. CREW monitors closely the laws and rules applicable to government agencies.

6. CREW is harmed by HHS's failure to comply with the FOIA, because that failure harms CREW's ability to provide full, accurate, and current information to the public. 5 U.S.C. §552(a)(6)(C).

7. Defendant HHS is an agency within the meaning of 5 U.S.C. §552(f). The HHS is the federal agency with possession and control of the requested records and is responsible for fulfilling Plaintiff's FOIA request.

## STATUTORY FRAMEWORK

### The Freedom of Information Act

8. The FOIA, 5 U.S.C. §552, requires agencies of the federal government to release requested records to the public unless one or more specific statutory exemptions apply.

9. An agency must respond to a party making a FOIA request within 20 working days, notifying that party of at least the agency's determination whether or not to fulfill the request, and of the requester's right to appeal the agency's determination to the agency head. 5 U.S.C. §552(a)(6)(A)(i).

10. An agency must respond to a FOIA appeal within 20 working days, notifying the appealing party of the agency's determination to either release the withheld records or uphold the denial. 5 U.S.C. §552(a)(6)(A)(ii).

11. In "unusual circumstances," an agency may delay its response to a FOIA request or appeal, but must provide notice and must also provide "the date on which a determination is expected to be dispatched." 5 U.S.C. §552(a)(6)(B).

12. This Court has jurisdiction, upon receipt of a complaint, "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. §552(a)(4)(B).

13. The FOIA provides a mechanism for disciplinary action against agency officials who have acted inappropriately in withholding records. Specifically, when requiring the release of

3

improperly withheld records, if the Court makes a written finding that "the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously," a disciplinary investigation is triggered. 5 U.S.C. §552(a)(4)(F).

## FACTS GIVING RISE TO PLAINTIFF'S CLAIMS FOR RELIEF

14. On January 7, 2005, *USA Today* reported that conservative commentator Armstrong Williams had been paid $240,000 by the Department of Education to promote the Bush administration's No Child Left Behind Law. Greg Toppo, White House paid journalist to promote law; Ethics of No Child Left Behind deal questioned, *USA Today*, January 7, 2005 (attached as Exhibit A). The contract with Williams was filtered through the Ketchum public affairs firm. Id.

15. The contract with Williams was only one of several attempts by the Bush administration to hide the source of government propaganda. Prior to the revelations concerning Armstrong Williams, the Government Accountability Office ("GAO") found that in two other recent incidents, federal agencies violated the prohibition on publicity and propaganda by hiring public relations firms to produce covert propaganda.

16. In May 2004, GAO found that video news releases created by Ketchum in support of the newly enacted Medicare law and distributed by Defendant HHS constituted illegal covert propaganda, because the releases failed to reveal the source of the information. U.S. Government Accountability Office, Department of Health and Human Services, Centers for Medicare and Medicaid Services - Video News Releases, GAO/B-302710 (May 19, 2004).

17. GAO subsequently found that public relations firm Fleishman Hillard had created video news releases which were distributed by the Office of National Drug Control Policy

("ONDCP"). U.S. Government Accountability Office, <u>Office of National Drug Control Policy -</u> <u>Video New Release</u>, GAO/B-303495 (Jan. 4, 2005).

18. More recently, GAO denied a request by Representatives Tom Davis and Mark Souder that GAO reconsider its Opinion concerning the ONDCP, and specifically its conclusion that ONDCP's use of appropriated funds to produce and distribute prepackaged news stories that were part of video news releases violated the ban on the use of appropriated funds for publicity or propaganda purposes. U.S. Government Accountability Office,<u> Reconsideration of B-303495</u> <u>Office of National Drug Control Policy,</u> GAO/B-303495.2 (Feb. 15, 2005).

19. On February 17, 2005, GAO issued an opinion reminding all heads of departments, agencies, and others concerned, of the constraints imposed by the publicity or propaganda prohibition on the use of prepackaged news stories and advising vigilance "to assure that agencies' activities comply with the prohibition." U.S. Government Accountability Office, <u>Prepackaged News Stories,</u> GAO/B-304272 (Feb. 17, 2005).

20. The Bush administration has rejected the conclusions of these GAO opinions, taking the position that this kind of covert propaganda is legal. Christopher Lee,<u> Administration Rejects</u> <u>Ruling on PR Videos</u>, *The Washington Post*, March 15, 2005 (attached as Exhibit B). Comptroller General David M. Walker continues to believe that the Bush administration's position is contrary to appropriations law and is unethical. As he explained in an interview, "This is more than a legal issue. It's also an ethical issue and involves important good government principles, namely the need for openness in connection with government activities, and expenditures . . . We should not just be seeking to do what's arguably right. We should be doing what's right." <u>Id</u>.

21.  After the Armstrong Williams contract became public, it was discovered that syndicated columnist Maggie Gallagher, who frequently wrote pieces supporting the Bush administration's $300 million initiative encouraging marriage, had received a $21,500 contract with the Defendant HHS.  Howard Kurtz, <u>Writer Backing Bush Plan Had Gotten Federal Contract</u>, *The Washington Post*, January 26, 2005 (attached as Exhibit C).

22.  Only three days after that revelation, the Defendant HHS disclosed that a third columnist had been paid to assist in promoting Bush administration policy.  Conservative columnist Mike McManus received $10,000 to support the President's marriage initiatives.  Siobhan McDonough, <u>Another Columnist Was Paid to Help Bush Administration Agency</u>, *San Francisco Chronicle,* January 29, 2005 (attached as Exhibit D).

23.  Because of the questions raised about the use of taxpayer dollars to fund public relations campaigns, the minority staff of the House Committee on Government Reform prepared a report on the Bush administration's public relations spending.  According to the report, in the four-year period from 2001 through 2004, the federal government spent over $250 million on 286 contracts with major public relations agencies.  U.S. House of Representatives Committee on Government Reform – Minority Staff, Special Investigations Division, <u>Federal Public Relations Spending</u>, p. 4 (Jan. 2005 (attached as Exhibit E).  The majority of this spending went to four large firms: Ketchum Communications received $97 million in contracts, The Matthews Media Group received $51.6 million in contracts, Fleishman Hillard received $41.1 million, and Porter Novelli received $33 million in contracts.  <u>Id.</u> at 6.

### Plaintiff's FOIA Request and Follow-Up

24.  By letter dated January 11, 2005, pursuant to the Freedom of Information Act,

Plaintiff requested that HHS produce records of any contacts between the agency and any

external public affairs firms, including, but not limited to Ketchum and Fleishman Hillard

(attached as Exhibit F).  Plaintiff also requested records of any contracts that HHS may have

entered into with any public affairs firms, as well as records of contacts between any HHS

employee and the employees of any public affairs firm with which HHS had a contractual

relationship.  Id.

25.  To date, Plaintiff has received no response to its request.  In a telephone conversation

of June 2, 2005, an agency official responsible for processing CREW's FOIA request advised

CREW's counsel that he could give no estimate of when HHS would complete its processing of

the FOIA request, but that some kind of response was at least weeks away.

26.  Under the FOIA, HHS was required to make a determination with respect to

Plaintiff's FOIA request within 20 days (excluding Saturdays, Sundays and legal holidays) after

receipt of the request.  According to Plaintiff's calculations, the 20th day fell on February 11,

2005.

27.  The statutory time limit for HHS to respond to Plaintiff's request has run out and

Plaintiff has constructively exhausted administrative remedies.  5 U.S.C. §552(a)(6)(C); *see also*

Judicial Watch v. Rossotti, 326 F.3d 1309, 1310, 356 U.S.App.D.C. 54, 55 (D.C. Cir. 2003);

Oglesby v. U.S. Dep't of the Army, 920 F.2d 57, 62, 287 U.S.App.D.C. 126, 131 (D.C. Cir.

1990).

## PLAINTIFF'S CLAIMS FOR RELIEF

### CLAIM ONE
### (Failure to Produce Records)

28. Plaintiff realleges and incorporates by reference all preceding paragraphs.

29. Plaintiff properly asked for records within HHS's control.

30. Plaintiff is entitled by law to access to the records requested under the FOIA, unless Defendant makes an explicit and justified statutory exemption claim.

31. Therefore, Defendant violated FOIA"s mandate to release agency records to the public by failing to release the records as Plaintiff specifically requested. 5 U.S.C. §§552(a)(3)(A), 552(a)(4)(B).

### CLAIM TWO
### (Failure to Respond)

32. Plaintiff realleges and incorporates by reference all preceding paragraphs.

33. On January 11, 2005, Plaintiff properly filed a FOIA request with HHS.

34. To date, Plaintiff has not received a response from HHS and HHS has exceeded the 20-working-day statutory time limit for such a response. 5 U.S.C. §552(a)(6)(A)(i).

35. Therefore, HHS has violated the FOIA's mandate to respond to Plaintiff's FOIA request within the statutory time period.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) Declare that HHS has violated the Freedom of Information Act by failing to lawfully satisfy Plaintiff's FOIA request of January 11, 2005;

(2) Order HHS to respond to Plaintiff's FOIA request;

(3) Order HHS to release immediately all records responsive to Plaintiff's FOIA request;

(4) Declare that HHS has violated the Freedom of Information Act by failing to lawfully satisfy Plaintiff's FOIA request of January 11, 2005;

(5) Award Plaintiff its reasonable attorney fees and litigation costs in this action, pursuant to 5 U.S.C. §552(a)(4)(E); and

(6) Grant such other and further relief as the Court may deem just and proper.


Respectfully submitted,


Melanie Sloan
(D.C. Bar No. 434584)
Anne L. Weismann
(D.C. Bar No. 298190)
Citizens for Responsibility and
 Ethics in Washington
11 Dupont Circle, N.W.
Washington, D.C.  20036
Phone: (202) 588-5565
Fax: (202) 588-5020

Attorneys for Plaintiff


Dated: June 6, 2005

9

**EXHIBIT A**

Copyright 2005 Gannett Company, Inc.
**USA TODAY**

**January** 7, 2005, Friday, FIRST EDITION
Correction Appended

**SECTION:** NEWS; Pg. 1A

**LENGTH:** 548 words

**HEADLINE:** White House paid journalist to promote law

**BYLINE: Greg Toppo**

**BODY:**
Seeking to build support among black families for its education reform law, the Bush administration paid a prominent black pundit $240,000 to promote the law on his nationally syndicated television show and to urge other black journalists to do the same.

The campaign, part of an effort to promote No Child Left Behind (NCLB), required commentator **Armstrong** Williams "to regularly comment on NCLB during the course of his broadcasts," and to interview Education Secretary Rod Paige for TV and radio spots that aired during the show in 2004.

Williams said Thursday he understands that critics could find the arrangement unethical, but "I wanted to do it because it's something I believe in."

The top Democrat on the House Education Committee, Rep. George Miller of California, called the contract "a very questionable use of taxpayers' money" that is "probably illegal." He said he will ask his Republican counterpart to join him in requesting an investigation.

The contract, detailed in documents obtained by **USA TODAY** through a Freedom of Information Act request, also shows that the Education Department, through the Ketchum public relations firm, arranged with Williams to use contacts with America's Black Forum, a group of black broadcast journalists, "to encourage the producers to periodically address" NCLB. He persuaded radio and TV personality Steve Harvey to invite Paige onto his show twice.

Williams said he does not recall disclosing the contract to audiences on the air, but told colleagues about it when urging them to promote NCLB.

05 1127

"I respect Mr. Williams' statement that this is something he believes in," said Bob Steele, a media ethics expert at The Poynter Institute for Media Studies. "But I would suggest that his commitment to that belief is best exercised through his excellent professional work rather than through contractual obligations with outsiders who are, quite clearly, trying to influence content and the nature of the discussion."

**FILED**

The contract may be illegal "because Congress has prohibited propaganda," or any sort of

lobbying for programs funded by the government, said Melanie Sloan of Citizens for Responsibility and Ethics in Washington. "And it's propaganda."

White House spokesman Trent Duffy said he couldn't comment because the White House is not involved in departments' contracts.

Ketchum referred questions to the Education Department, whose spokesman, John Gibbons, said the contract followed standard government procedures. He said there are no plans to continue with "similar outreach."

Williams' contract was part of a $1 million deal with Ketchum that produced "video news releases" designed to look like news reports. The Bush administration used similar releases last year to promote its Medicare prescription drug plan, prompting a scolding from the Government Accountability Office, which called them an illegal use of taxpayers' dollars.

Williams, 45, a former aide to U.S. Supreme Court Justice Clarence Thomas, is one of the top black conservative voices in the nation. He hosts *The Right Side* on TV and radio, appears on other shows as a commentator and writes op-ed pieces for newspapers, including **USA TODAY,** while running a public relations firm, Graham Williams Group.

**CORRECTION-DATE:** January 10, 2005, Monday

**CORRECTION:**
Payments for commentator **Armstrong** Williams to push an administration education program came from the Education Department, not the White House. A headline on 1A Friday was incorrect.

**GRAPHIC:** PHOTO, Color; Williams: Was paid $240,000 in deal.

**LOAD-DATE:** January 17, 2005

◄ prev  Document 2 of 3 next ►

About LexisNexis™ | Terms and Conditions | Privacy Policy | Support Identifier
Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

**EXHIBIT B**



Copyright 2005 The Washington Post

# The Washington Post

## washingtonpost.com

The Washington Post

March 15, 2005 Tuesday
Final Edition

**SECTION:** A Section; A21

**LENGTH:** 685 words

**HEADLINE: Administration Rejects Ruling On PR Videos;**
GAO Called Tapes Illegal Propaganda

**BYLINE:** Christopher Lee, Washington Post Staff Writer

**BODY:**


The Bush administration, rejecting an opinion from the Government Accountability Office, said last week that it is legal for federal agencies to feed TV stations prepackaged news stories that do not disclose the government's role in producing them.

That message, in memos sent Friday to federal agency heads and general counsels, contradicts a Feb. 17 memo from Comptroller General David M. Walker. Walker wrote that such stories -- designed to resemble independently reported broadcast news stories so that TV stations can run them without editing -- violate provisions in annual appropriations laws that ban covert propaganda.

But Joshua B. Bolten, director of the Office of Management and Budget, and Steven G. Bradbury, principal deputy assistant attorney general at the Justice Department, said in memos last week that the administration disagrees with the GAO's ruling. And, in any case, they wrote, the department's Office of Legal Counsel, not the GAO, the investigative arm of Congress, provides binding legal interpretations for federal agencies to follow.

The legal counsel's office "does not agree with GAO that the covert propaganda prohibition applies simply because an agency's role in producing and disseminating information is undisclosed or 'covert,' regardless of whether the content of the message is 'propaganda,' " Bradbury wrote. "Our view is that the prohibition does not apply where there is no advocacy of a particular viewpoint, and therefore it does not apply to the legitimate provision of information concerning the programs administered by an agency."

The existence of the memos was reported Sunday by the New York Times.

**FILED**

Supporters say prepackaged news stories are a common public relations tool with roots in previous 2005 administrations, that their exterior packaging typically identifies the government as the source, and that

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**05 1127**    03/15/2005

it is up to news organizations, not the government, to reveal to viewers where the material they broadcast came from.

Critics have derided such video news releases as taxpayer-financed attempts by the administration to promote its policies in the guise of independent news reports.

Within the last year, the GAO has rapped the Department of Health and Human Services and the Office of National Drug Control Policy for distributing such stories about the Medicare drug benefit and the administration's anti-drug campaign, respectively.

In an interview yesterday, Walker said the administration's approach is both contrary to appropriations law and unethical.

"This is more than a legal issue. It's also an ethical issue and involves important good government principles, namely the need for openness in connection with government activities and expenditures," Walker said. "We should not just be seeking to do what's arguably legal. We should be doing what's right."

White House spokesman Scott McClellan said yesterday that federal agencies have used video news releases for years. "As long as they are providing factual information, it's okay," he said.

Walker said that even by that standard, some prepackaged news stories are out of bounds.

"Congress has got to settle it -- either Congress or the courts," Walker said. "Congress may need to provide additional guidance with regard to their intent in this overall area."

Sen. Frank Lautenberg (D-N.J.) said through a spokesman yesterday that he will try to attach language to an appropriations bill to clarify that taxpayer money cannot be spent on such productions. He and fellow Democratic Sen. Edward M. Kennedy (Mass.) wrote to President Bush yesterday asking him to pull back the new memos from Justice and the OMB.

They noted that following revelations this year that the Education Department had paid conservative commentator Armstrong Williams to promote the No Child Left Behind law, Bush had directed agencies to abandon such clandestine public relations practices.

"Whether in the form of a payment to an actual journalist, or through the creation of a fake one, it is wrong to deceive the public with the creation of phony news stories," the lawmakers wrote.

**LOAD-DATE:** March 15, 2005

**EXHIBIT C**



Copyright 2005 The Washington Post

# The Washington Post

## washingtonpost.com

The Washington Post

January 26, 2005 Wednesday
Final Edition

**SECTION:** Style; C01

**LENGTH:** 822 words

**HEADLINE: Writer Backing Bush Plan Had Gotten** Federal Contract

**BYLINE:** Howard Kurtz, Washington Post Staff Writer

**BODY:**

In 2002, syndicated columnist Maggie Gallagher repeatedly defended President Bush's push for a $300 million initiative encouraging marriage as a way of strengthening families.

"The Bush marriage initiative would emphasize the importance of marriage to poor couples" and "educate teens on the value of delaying childbearing until marriage," she wrote in National Review Online, for example, adding that this could "carry big payoffs down the road for taxpayers and children."

But Gallagher failed to mention that she had a $21,500 contract with the Department of Health and Human Services to help promote the president's proposal. Her work under the contract, which ran from January through October 2002, included drafting a magazine article for the HHS official overseeing the initiative, writing brochures for the program and conducting a briefing for department officials.

"Did I violate journalistic ethics by not disclosing it?" Gallagher said yesterday. "I don't know. You tell me." She said she would have "been happy to tell anyone who called me" about the contract but that "frankly, it never occurred to me" to disclose it.

Later in the day, Gallagher filed a column in which she said that "I should have disclosed a government contract when I later wrote about the Bush marriage initiative. I would have, if I had remembered it. My apologies to my readers."

In the interview, Gallagher said her situation was "not really anything near" the recent controversy involving conservative commentator Armstrong Williams. Earlier this month Williams apologized for not disclosing a $241,000 contract with the Education Department, awarded through the Ketchum public relations firm, to promote Bush's No Child Left Behind law through advertising on his cable TV and syndicated radio shows and other efforts.

**05 1127**    JUN - 7 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Gallagher received an additional $20,000 from the Bush administration in 2002 and 2003 for writing a report, titled "Can Government Strengthen Marriage?", for a private organization called the National Fatherhood Initiative. That report, published last year, was funded by a Justice Department grant, said NFI spokesman Vincent DiCaro. Gallagher said she was "aware vaguely" that her work was federally funded.

In columns, television appearances and interviews with such newspapers as The Washington Post, Gallagher last year defended Bush's proposal for a constitutional amendment barring same-sex marriage.

Wade Horn, HHS assistant secretary for children and families, said his division hired Gallagher as "a well-known national expert," along with other specialists in the field, to help devise the president's healthy marriage initiative. "It's not unusual in the federal government to do that," he said.

The essay Gallagher drafted appeared under Horn's byline -- with the headline "Closing the Marriage Gap" -- and ran in Crisis magazine, which promotes humanism rooted in Catholic Church teachings. Horn said most of the brochures written by Gallagher -- such as "The Top Ten Reasons Marriage Matters" -- were not used as the program evolved.

"I don't see any comparison between what has been alleged with Armstrong Williams and what we did with Maggie Gallagher," said Horn, who founded the National Fatherhood Initiative before entering government. "We didn't pay her to write columns. We didn't pay her to promote the president's healthy marriage initiative at all. What we wanted to do was use her expertise." The Education Department is now investigating the Williams contract.

The author of three books on marriage, Gallagher is president of the Washington-based Institute for Marriage and Public Policy, a frequent television guest and has written on the subject for such publications as the New York Times, Wall Street Journal and Weekly Standard.

While she was being paid by HHS in 2002, Gallagher in her syndicated column dismissed the arguments against "President Bush's modest marriage initiative" as "nonsense," writing: "Bush plans to use a tiny fraction of surplus welfare dollars to fund marriage education services for at-risk couples."

In a column later that year that appeared in the Myrtle Beach (S.C.) Sun News, Gallagher said Bush's welfare-revision bill would, among other things, encourage "stable marriages," and that it was a "scandal" for Democrats to reject the president's plan and fail to offer an alternative.

National Review Editor Rich Lowry said of the HHS contract: "We would have preferred that she told us, and we would have disclosed it in her bio."

Tribune Media Services dropped Williams's column after his administration contract was disclosed. Universal Press Syndicate, which distributes Gallagher's column, plans no such action.

"We did not know about the contract," spokeswoman Kathie Kerr said. "We would have probably liked to have known." But, Kerr said, "this is what we hired Maggie to write about. It probably wouldn't have changed our mind to distribute it."

**LOAD-DATE:** January 26, 2005

**EXHIBIT D**

**SFGate**.com    www.sfgate.com    Return
to regular view

Another columnist was paid to help Bush administration agency
- SIOBHAN McDONOUGH, Associated Press Writer
Friday, January 28, 2005

(01-28) 14:47 PST WASHINGTON (AP) --

The Department of Health and Human Services said Friday that a third conservative
columnist was paid to assist in promoting a Bush administration policy.

Columnist Mike McManus received $10,000 to train marriage counselors as part of the
agency's initiative promoting marriage to build strong families, said Wade Horn, assistant
secretary for children and families.

The disclosure came as the Government Accountability Office sent a letter to the Education
Department on Friday asking for all materials related to its contract dealings with a
prominent conservative media commentator.

That department, through a contract with the public relations firm Ketchum, hired
commentator Armstrong Williams to produce ads that featured former Education Secretary
Rod Paige and promoted President Bush's No Child Left Behind law. The contract also
committed Williams, who is black, to provide media access for Paige and to persuade other
black journalists to talk about the law.

Federal law bans the use of public money on propaganda.

The Education Department received the GAO's letter and is reviewing it, said department
spokeswoman Susan Aspey. "Secretary Spelling has made it very clear she is getting to the
bottom of this."

Margaret Spellings started this week, replacing Paige.

In a letter to Sens. Arlen Specter, R-Pa., and Tom Harkin, D-Iowa, dated Friday, Spellings
wrote, "At this point, what I can say is that at a minimum, there were errors of judgments at
the Department, and I am diligently working to get to the bottom of it all."

The lawmakers are the chairman and the ranking member of a panel that oversees education
spending, and their subcommittee is looking into the matter.

Spellings also said the department has directed Ketchum to stop all work under the contract.

Earlier this week, Bush ordered his Cabinet secretaries not to hire columnists to promote
administration agendas. The declaration was prompted by reports that Williams and another
columnist, Maggie Gallagher, had been paid by the administration.

All three columnists failed to disclose to their readers their relationships with the
administration.

Health and Human Services' Horn stressed McManus was not paid to write favorably.

about the administration. Still, he said, HHS has now implemented a rule to prohibit the use of outside consultants or contractors who have any connection with the press.

"There's a growing misperception that taxpayers' money is being used to pay columnists to use their position in the media to portray the administration in a positive light," Horn said. "I felt a compelling need to draw a bright line in order to restore the public's confidence that we are not doing that."

McManus was hired by the Lewin Group, which had a contract with HHS to support community-based programs. As co-founder and president of the nonprofit group Marriage Savers, his expertise was applied to help the community-based programs to build "the capacity to develop healthy marriage initiatives," Horn said.

The Institute for Youth Development, which got a grant from HHS, also is paying Marriage Savers $49,000 to offer guidance to unmarried couples who are having children, Horn said.

McManus has written supportively about the HHS marriage initiative in many of his columns since the consulting work began in January 2003.

McManus' weekly column appears in about 50 newspapers. He would not comment Friday but said he planned to issue a statement.

HHS spokesman Bill Pierce said he was unaware of any other columnists or commentators who were being paid to do work for the department.

Determining who is considered a journalist isn't always easy, Horn said.

"Oftentimes they will be experts in an area, write op-eds, be a media personality, write columns," he said. "The question really is: Is it legitimate for the government to draw upon that?"

Gallagher apologized this week to readers for not disclosing a $21,500 contract with HHS to help create materials promoting the marriage initiative.

The Education Department paid Williams $240,000 to produce television and radio ads promoting the No Child Left Behind Act. Williams has apologized and called it a mistake in judgment not to disclose that the administration was paying him.

Sens. Edward Kennedy, D-Mass., and Frank Lautenberg, D-N.J., had requested the GAO to expand a continuing inquiry into the matter.

"The issue here isn't just whether a journalist violated ethics, but whether the Bush Administration broke the law," Lautenberg said Friday. "If the GAO finds that the payment to Armstrong Williams was an illegal use of taxpayer dollars, then the money should be returned and Education Department officials should be held accountable."

USA Today first reported the McManus contract Friday.

URL: http://sfgate.com/cgi-bin/article.cgi?

**EXHIBIT E**



UNITED STATES HOUSE OF REPRESENTATIVES
COMMITTEE ON GOVERNMENT REFORM — MINORITY STAFF
SPECIAL INVESTIGATIONS DIVISION
JANUARY 2005

# FEDERAL PUBLIC RELATIONS SPENDING

## PREPARED FOR:

DEMOCRATIC LEADER NANCY PELOSI
DEMOCRATIC WHIP STENY H. HOYER
REP. HENRY A. WAXMAN
REP. JOHN D. DINGELL
REP. DAVID R. OBEY
REP. CHARLES B. RANGEL
REP. GEORGE MILLER
REP. LOUISE MCINTOSH SLAUGHTER
REP. BENNIE G. THOMPSON
REP. ROSA L. DELAURO

05 1127

**FILED**

JUN - 7 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## TABLE OF CONTENTS

Executive Summary ........................................................................................................................1

Background ....................................................................................................................................2

Methodology ..................................................................................................................................3

Findings .........................................................................................................................................4

    A.    The Growth in Federal Public Relations Contracts ................................................4

    B.    The Federal Agencies with the Highest Public Relations Spending ..........................5

    C.    The Public Relations Firms with the Most Federal Contracts ...................................6

    D.    The Rise of Noncompetitive Public Relations Contracts ...........................................6

    E.    Underestimation ........................................................................................................7

Conclusion .....................................................................................................................................7

FEDERAL PUBLIC RELATIONS SPENDING

## EXECUTIVE SUMMARY

Recently, questions have been raised about the use of taxpayer dollars to fund public relations campaigns. The Government Accountability Office has found that the White House Office of National Drug Control Policy and the Department of Health and Human Services engaged in illegal "covert propaganda" by hiring a public relations firm to produce and disseminate fabricated video news reports. Investigative reporters have disclosed that the Department of Education paid a journalist to promote the No Child Left Behind Act in television and radio appearances and that the Department of Health and Human Services had a contract with a syndicated columnist who promoted the President's marriage initiative.

At the request of Democratic Leader Pelosi, Democratic Whip Hoyer, and Reps. Waxman, Dingell, Obey, Rangel, Miller, Slaughter, Thompson, and DeLauro, this report examines federal spending on public relations contracts. It finds that federal spending for public relations has more than doubled under the Bush Administration. While not all public relations spending is illegal or inappropriate, this rapid rise in public relations contracts at a time of growing budget deficits raises questions about the priorities of the Administration.

Specifically, the report finds:

- In 2004, the Bush Administration spent over $88 million on contracts with public relations agencies.

- The value of federal contracts with public relations agencies has increased significantly over the last four years. In 2000, the last year of the Clinton Administration, the federal government spent $39 million on contracts with major public relations agencies. By 2004, the value of these PR contracts had grown by almost $50 million, an increase of 128%.

- An increasing number of PR contracts are being awarded without full and open competition. During the last year of the Clinton Administration, less than 20% of PR contracts were awarded without full and open competition. By 2004, over 40% of PR contracts, worth $37 million in total, were awarded on a noncompetitive basis.

- The Center for Medicare and Medicaid Services spent over $94 million on contracts with public relations agencies over the last four years, the most of any federal agency. The three public relations agencies that received the most in federal contracts over the last four years are Ketchum Communications ($97 million), Matthews Media Group ($52 million), and Fleishmann Hillard ($41 million).

FEDERAL PUBLIC RELATIONS SPENDING

## BACKGROUND

For over 50 years, annual federal appropriations laws have prohibited the expenditure of appropriated funds on "publicity and propaganda," unless authorized by Congress. This longstanding prohibition has been interpreted by the Government Accountability Office to prohibit covert propaganda that does not identify the government as the source, information intended for "self-aggrandizement" or "puffery," and materials that serve a solely partisan purpose.[1] The prohibition reflects the principle that the federal government should not use its vast resources to influence public opinion on political and policy issues.

In two recent incidents, the Government Accountability Office has found that federal agencies violated the prohibition on publicity and propaganda by hiring a public relations firm to produce "covert propaganda." In May 2004, GAO found that video news releases distributed to television stations for the Department of Health and Human Services constituted illegal covert propaganda because they did not reveal the source of the information.[2] These releases featured paid contractors posing as reporters who spoke in positive terms about the newly enacted changes to Medicare. In January 2005, in a separate investigation, GAO made a similar finding regarding fabricated video news releases produced by a contractor and distributed by the White House Office of National Drug Control Policy.[3]

An investigation by *USA Today* revealed another example of covert propaganda.[4] The Department of Education hired a public relations agency, Ketchum Incorporated, to promote the No Child Left Behind Act. As part of this contract, Ketchum entered into a subcontract to pay Armstrong Williams, a conservative commentator, to promote the No Child Left Behind Act on his radio and television appearances. The contract with Mr. Williams specifically provided that Mr. Williams would "regularly comment on NCLB during the course of his

---

[1]     *E.g.*, U.S. Government Accountability Office, *Department of Health and Human Services, Centers for Medicare & Medicaid Services — Video News Releases*, 10 (May 19, 2004) (GAO/B-302710).

[2]     U.S. Government Accountability Office, *Department of Health and Human Services, Centers for Medicare & Medicaid Services — Video News Releases* (May 19, 2004) (GAO/B-302710).

[3]     U.S. Government Accountability Office, *Office of National Drug Control Policy — Video News Release* (Jan. 4, 2005) (GAO/B-303495).

[4]     *White House Paid Commentator to Promote Law*, USA Today (Jan. 7, 2005).

FEDERAL PUBLIC RELATIONS SPENDING

broadcasts."[5] Neither Mr. Williams nor the Department of Education disclosed these payments.

Similarly, a recent investigation by the *Washington Post* found that syndicated columnist Maggie Gallagher, who frequently wrote on the President's $300 million initiative encouraging marriage, had received a $21,500 contract with the Department of Health and Human Services. The contract called on Ms. Gallagher to draft an article for Department officials and draft brochures for the Department promoting the marriage initiative. Neither Ms. Gallagher nor the Department of Health and Human Services disclosed these payments.[6]

As part of an investigation into the use of covert propaganda by federal agencies, Democratic Leader Nancy Pelosi, Democratic Whip Steny H. Hoyer, and Reps. Henry A. Waxman, John D. Dingell, David R. Obey, Charles B. Rangel, George Miller, Louise McIntosh Slaughter, Bennie G. Thompson, and Rosa L. DeLauro asked the Special Investigations Division to analyze executive branch spending on public relations efforts. This report presents the results of this analysis.

## METHODOLOGY

This report is based on an analysis of data obtained from the Federal Procurement Data System (FPDS) for the four years from the beginning of calendar year 2001 through the end of 2004. For comparison purposes, the report also examined FPDS data from the Clinton Administration. The FPDS contains a record of each contract action by the federal government, including details on the agency signing the contract, the contractor, the amount of the contract, the services provided, and the bidding process. The database contains over two million records detailing over $1 billion worth of federal government contracts since 2000.[7]

The FPDS was searched to identify all contracts with 40 major public affairs agencies. These 40 agencies were either identified by *The Hill* in June 2004 as "the best of the best" policy- and politics-related PR firms,[8] or were identified by the *Washington Business Journal* in January 2002 as the largest public affairs firms in the Washington D.C. area.[9] Fifteen of these 40 public affairs agencies

---

[5]    Department of Education, *Minority Outreach Campaign — Statement of Work #9,* Modification No. 7 of Contract No. ED-03-PO-1725 (Jan. 6, 2004).

[6]    *Writer Backing Bush Plan Had Gotten Federal Contract,* Washington Post (Jan. 26, 2005).

[7]    Additional details on the FPDS data are available at the Federal Procurement Data System website, http://www.fpds-ng.com/.

[8]    *Public Relations: The Best of the Best,* The Hill (June 24, 2004).

[9]    *Largest Public Relations Firms in the Metro Area,* Washington Business Journal (Jan. 2002).

received contracts with the federal government over the last four years. They are APCO Worldwide, Burson-Marsteller, Edelman Public Relations, Eisner Communications, EPB/Kaufman, Equals Three Communications, Fleishman Hillard, Hill and Knowlton, Ketchum Communications, Matthews Media Group, National Media Incorporated, Ogilvy Public Relations, Porter Novelli, RMR Associations, and Widmeyer Communciations.[10]

Not all government PR contracts are problematic. When authorized by Congress, and conducted in a fashion that does not mislead the public, PR contracts to help federal agencies educate the public about health or consumer risks or other similar topics are both legal and appropriate. This report does not assess the legality or appropriateness of any specific contracts.

## FINDINGS

## The Growth in Federal Public Relations Contracts

In the four-year period from 2001 through 2004, the federal government spent over $250 million on 286 contracts with major public relations agencies. The number of PR contracts and the amount spent has risen significantly during this period.

In 2000, the last full fiscal year of the Clinton Administration, the federal government spent $38.6 million on 64 contracts with major public relations agencies.[11] In 2001, the first year of the Bush Administration, the federal government spent $36.6 million on 67 contracts with major public relations agencies.

In 2002, the first fully budgeted year of the Bush Administration, federal spending on PR contracts increased to $64.7 million on 67 contracts. This spending level remained steady in 2003, during which $64 million was spent on 95 contracts.

---

[10]   The major public relations companies that did not receive contracts are the Bivings Group; CLS; D.C. Navigators; Dittus Communications; Fenn Communications; Fenton Communications; Fitzgerald Communications; GC Strategic Advocacy; the Glover Park Group; Golin Harris; Issue Dynamics; the Kamber Group; McCarthy Marcus Hennings; MacWilliams, Robinson, and Porter; the Merritt Group; O'Keefe and Co.; PodestaMattoon; Policy Impact; Powell Tate/Weber Shandwick; Public Strategies; QuinnGillespie; Smith and Haroff; STRAT@Comm; and Ruder Finn.

[11]   Over the four years from 1997–2000, the Clinton Administration spent only $128 million on PR contracts. The Clinton Administration spent $12 million in 1997, $12 million in 1998, $65 million in 1999, and $38.6 million in 2000.

FEDERAL PUBLIC RELATIONS SPENDING

In 2004, spending by the federal government on PR contracts rose again. Last fiscal year, the federal government spent $88.2 million on 60 contracts with public relations agencies. (Figure 1.)

### Figure 1: Federal Government Contracting with Major Public Relations Agencies Is Increasing Rapidly



## The Federal Agencies with the Highest Public Relations Spending

From 2001 through 2004, 38 different federal agencies had contracts with major public relations agencies. Of these federal agencies, 18 had contracts that paid public relations agencies over one million dollars, and 8 had contracts that paid public relations agencies over ten million dollars.

The five agencies with the highest expenditures on public relations were the Centers for Medicare and Medicaid Services ($94 million), the National Institutes of Health ($57 million), the Minerals Management Service ($22 million), the Centers for Disease Control ($21 million), and the Health Resources and Services Administration ($13 million).

The Center for Medicare and Medicaid Services was the highest spending agency in 2004 and 2003, with PR contracts worth $56 million in 2004 and $32 million in 2003. The National Institutes of Health was the top-spending agency in 2002 and 2001, with contracts worth $18.1 million in 2002 and $15.2 million in 2001. In 2000, the last full fiscal year of the Clinton Administration, the United States Mint was the top-spending agency, with contracts worth $16 million.

## The Public Relations Firms with the Most Federal Contracts

Fifteen major public relations agencies received contracts with the federal government from 2001 through 2004. The majority of this spending went to four large firms. Ketchum Communications received $97 million in contracts, over one third of the total $250 million in PR spending. The Matthews Media Group received $51.6 million in contracts, Fleishmann Hillard received $41.1 million, and Porter Novelli received $33 million in contracts.

## The Rise of Noncompetitive Public Relations Contracts

Under federal procurement laws, the federal government is supposed to award contracts under "full and open competition." Except in limited circumstances, these procurement laws require the government to provide public notice of contract opportunities and to invite all qualified companies to submit competitive bids.[12]

In 2000, the last full year of the Clinton Administration, over 80% of PR contracts were awarded after full and open competition. Only 16% of contracts, worth $6 million, were awarded noncompetitively.

Under the Bush Administration, the number and size of noncompetitive PR contracts has risen dramatically. The percentage of contracts that were awarded noncompetitively rose from 19% in 2001 to 41% in 2004. (Figure 2.)

**Figure 2: The Use of Noncompetitive PR Contracts Has Increased under the Bush Administration**



FEDERAL PUBLIC RELATIONS SPENDING

## Underestimation

The findings in this report are likely to underestimate the extent of PR contracting under the Bush Administration. The FPDS database used in compiling this report does not yet contain complete data from all federal agencies for 2004. As of December 31, 2004, several large federal agencies, including the Departments of Homeland Security, Justice, Commerce, State, Agriculture, and Interior, had not completed reporting all of their 2004 contracting information to the Federal Procurement Data System.[13] When the full data is reported to the system, the value of the PR contracts for 2004 is likely to increase even further.

Moreover, the analysis only includes contracts with major public relations firms. It does not include smaller contracts (such as the HHS contract with conservative columnist Maggie Gallagher to promote the president's marriage initiatives). Thus, while it provides a clear indication that government spending with public relations firms is increasing, it cannot provide an exhaustive accounting of all contracts.

## CONCLUSION

This report finds that federal spending for PR contracts has risen significantly under the Bush Administration. In 2004, the federal government spent over $88 million on contracts with public relations agencies, much of it through noncompetitive contracts. This spending has more than doubled since 2000, the last full year of the Clinton Administration. The increased spending on PR contracts has occurred at the same time that the federal budget has gone from a surplus of $237 billion to a deficit of $415 billion. While not all public relations spending is illegal or inappropriate, this rapid rise in public relations contracts at a time of growing budget deficits raises questions about the priorities of the Administration.

---

[12]    Competition in Contracting Act (Title VII of division B of the Deficit Reduction Act of 198), P.L. 98-369.

[13]    Federal Procurement Data System — Next Generation, *FPDS-NG FY04 Contract Actions Certifications and Estimate Contract Actions Submitted by Agencies as of 12/30/2004* (Jan. 2004) (online at http://www.fpdsng.com/ downloads/agency_data_submit_list.htm).

**EXHIBIT F**

Ci___ns for Responsibility and Ethics i___ashington

January 11, 2005

Freedom of Information Officer
U.S. Department of Health and Human Services
Room 645-F
Hubert H. Humphrey Building
Independence Ave., S.W.
Washington, D.C. 20201

**BY FAX:** 202-690-8320

Re:    Freedom of Information Act Request

Dear Officer:

Citizens for Responsibility and Ethics in Washington("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, audiotapes, videotapes and photographs, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 552 et seq.

This request relates to any contact, dating from January 1, 2001, that any office of the Department of Health and Human Services may have had with any external public affairs firms including, but not limited to Ketchum Public Affairs and Fleischman-Hilliard Public Affairs. Specifically, we request the release of any contracts the Department of Health and Human Services may have entered into with any public affairs firm. We further request records of contacts any Department of Health and Human Services employee may have had with any employee of any public affairs firm with which the Department of Health and Human Services had a contractual relationship.

Please search for responsive records regardless of format, medium, or physical characteristics. We seek records of any kind, including electronic records, audiotapes, videotapes and photographs. Our request includes any telephone messages, voice mail messages, daily agenda and calenders, information about scheduled meetings, whether in person or over the telephone, agendas for those meetings, participants included in those meetings, minutes of any such meetings, the topics discussed at those meetings, e-mail regarding meetings, e-mail 05 1127 facsimilies sent as a result of those meetings, and transcripts and notes of any such meetings.

There is no basis for claiming that the records requested herein are exempt from immediate disclosure under FOIA. Each of these records is described by 5 U.S.C. §552(a)(2) as information an agency is required to make available to the public and the United States Attorney General has indicated that the Justice Department will only defend a decision not to disclose FILED documents where a "sound legal basis" for non-disclosure exists. Memorandum from Attorney General John Ashcroft to Heads of Departments and Agencies on the Freedom of Information 7 2005 Act, October 12, 2001.    JUN

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

FOIA Officer
January 11, 2005
Page Two

If, however, it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide it with an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974). As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603 F.2d 945, 949 (D.C. Cir. 1979). Moreover, the Vaughn index must "describe each document or portion thereof withheld, and for each withholding it must discuss the consequences of supplying the sought-after information." King v. U.S. Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) *(emphasis added)*. Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" Id. at 224 (citing Mead Data Central v. U.S. Dept. of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977)).

In the event that some portions of the requested documents are properly exempt from disclosure, please disclose any reasonably segregable nonexempt portions of the requested documents. *See* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt. . . "); *see also* Schiller v. National Labor Relations Board, 964 F.2d 1205, 1209 (D.C. Cir. 1992); 15 C.F.R. §4.6. If it is your position that a document contains non-exempt segments but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt and how the material is dispersed throughout the document. Mead Data Central, 566 F.2d at 261. Claims of nonsegregability must be made with the same degree of detail as required for claims of exemptions in a Vaughn index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

### Fee Waiver Request

In accordance with 5 U.S.C. §552(a)(4)(A)(iii), CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government and the disclosures will likely contribute to a better understanding of relevant governmental procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. §552(a)(4)(A)(iii), 15 C.F.R. §4.11(k)(1). *See eg.*, McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the Department of Health and Human Service's efforts to shape public opinion.

FOIA Officer
January 11, 2005
Page Three

CREW is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the governmental decision making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memorandums or reports.

Under these circumstances, CREW fully satisfies the criteria for a fee waiver.

### Conclusion

Please respond to this request in writing within twenty (20) days as required under 5 U.S.C. §552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide it with all requested documents or portions of documents which are available within that time period.

If you have any questions about this request or foresee problems in fully releasing the requested records within the twenty day period, please call me within that time period. I can be reached at (202)-588-5565. Please send the requested documents to Melanie Sloan, Citizens for Responsibility and Ethics in Washington, 11 Dupont Circle, N.W., 2nd Floor, Washington, D.C. 20036.

Sincerely,

Melanie Sloan
Executive Director
Citizens for Responsibility and Ethics in Washington

TRANSMISSION VERIFICATION REPORT

```
TIME    : 01/11/2005 10:07
NAME    : CREW
FAX     : 2025885563
TEL     : 2025885565
SER.#   : BROM2J870748
```

```
DATE,TIME          01/11  10:06
FAX NO./NAME       6908320
DURATION           00:01:10
PAGE(S)            03
RESULT             OK
MODE               STANDARD
                   ECM
```