Melanie Sloan
D.C. Bar No. 454584
Anne L. Weismann
D.C. Bar No. 298190
Citizens for Responsibility
and Ethics in Washington
11 Dupont Circle, N.W.
2nd Floor
Washington, D.C.  20036
202-588-5565

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>11 Dupont Circle, N.W.<br>Washington, D.C.  20036<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>Independence Avenue, S.W.<br>Washington, D.C.  20201<br><br>　　　　Defendant. | Civil Action No. 1:05CV01127(CKK) |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S MOTION
<u>FOR PARTIAL SUMMARY JUDGMENT</u>**

<u>INTRODUCTION</u>

Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") brought this

action under the Freedom of Information Act ("FOIA") when defendant U.S. Department of

Health and Human Services ("HHS") failed to respond at all to Plaintiff's FOIA request. Plaintiff is seeking documents relating to HHS's contracts and contacts with public affairs firms.

In its request, CREW also sought a waiver of all fees associated with the processing of its request because the request concerns the operations of the federal government and disclosure will likely contribute to a better public understanding of HHS's efforts to shape public opinion. Indeed, HHS has been at the center of a public controversy over whether HHS and other agencies engaged in illegal covert propaganda when they distributed prepackaged video news releases created by outside public relations firms and failed to reveal the source of the information, thereby implying that the propaganda pieces were objective news stories created by the news media for direct public dissemination. Quite obviously, revelation of the contracts and contacts HHS had with public relations firms would shed light on this issue.

HHS nevertheless denied CREW's fee waiver request, determining initially, and then on appeal, that CREW had failed to demonstrate that the records it seeks will shed light on the operations and activities of the government. HHS also concluded that CREW had failed to demonstrate its ability to disseminate the requested information to the public, notwithstanding CREW's showing in its administrative appeal that it routinely disseminates comparable information to the public through reports and its web site.

As explained more fully below, HHS's determinations are wrong as a matter of fact and law. The record before this Court amply demonstrates CREW's entitlement to a fee waiver. Given the lack of any significant analysis in the agency's fee determinations, and its failure to address, much less rebut, the legal and factual showing CREW made, the Court should reject HHS's summary conclusions on the fee issue and grant Plaintiff's motion for partial summary

judgment.

## STATUTORY AND REGULATORY BACKGROUN D

The Freedom of Information Act requires each agency to promulgate regulations specifying a fee schedule for the processing of FOIA requests and establishing procedures and guidelines for the waiver or reduction of fees.  5 U.S.C. §552(a)(4)(A).  The FOIA further provides that responsive documents

> shall be furnished without any charge or at a charge reduced below the fees established under [agency regulations] . . . if disclosure of the information is in the public interest because it is likely to contri-bute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.

Id. at §552(a)(4)(A)(iii).

HHS regulations mirror and expand upon the FOIA.  45 CFR 5.45.  Toward that end, they provide an explanation of the "public interest" component of the fee waiver requirement and establish four factors that HHS will consider.  These include: (1) how the disclosable records "pertain to the operations or activities of the Federal Government"; (2) whether disclosure would "reveal any meaningful information about government operations or activities," including whether the public would learn something that is "not already public knowledge"; (3) whether disclosure would "advance the understanding of the general public" as opposed to "a narrow segment of interested persons"; and (4) whether the public contribution will be "a significant one."  Id. at 5.45(b)(1)-(4).

As provided by the FOIA, courts review agency fee waiver denials under a de novo standard.  5 U.S.C. §552(a)(4)(A)(vii).  A court's review is limited, however, to the record

before the agency.  Id.

## FACTUAL BACKGROUND

By letter dated January 11, 2005, Plaintiff requested under the FOIA that HHS produce records of any contacts between the agency and any external public affairs firms, including but not limited to Ketchum and Fleishman Hillard.  See Exhibit F to Plaintiff's Amended Complaint.  Plaintiff also requested records of any contracts that HHS may have entered into with any public affairs firms, as well as records of any contacts between any HHS employee and the employees of any public affairs firm with which HHS had a contractual relationship.  Id.

CREW also requested a waiver of fees associated with the processing of its request.  CREW explained that the records it seeks "are likely to contribute to the public's understanding of the Department of Health and Human Service's efforts to shape public opinion."  Exhibit F to Amended Complaint.  CREW further explained that it is a non-profit corporation that uses a combination of research, litigation and advocacy to advance its mission of protecting citizens' right to be aware of the activities of government officials and to ensuring the integrity of those officials.  Id.  CREW also stated that it would analyze all information responsive to its request and "likely share its analysis with the public, either through memorandums or reports."  Id.

Preceding CREW's FOIA request were widespread reports in the media that HHS and other agencies had violated the prohibition on publicity and propaganda by hiring public relations firms to produce covert propaganda.  For example, in May 2004, the Government Accountability Office ("GAO") found that video news releases created by Ketchum in support of the newly enacted Medicare law and distributed by Defendant HHS constituted illegal covert propaganda, because the releases failed to reveal the source of the information.  U.S.

Government Accountability Office, <u>Department of Health and Human Services, Centers for Medicare and Medicaid Services - Video News Releases</u>, GAO/B-302710 (May 19, 2004).  In addition, syndicated columnist Maggie Gallagher, who frequently wrote pieces supporting the Bush administration's $300 million initiative encouraging marriage, received a $21,500 contract with HHS.  Howard Kurtz, <u>Writer Backing Bush Plan Had Gotten Federal Contract</u>, *The Washington Post*, January 26, 2005 (attached as Exhibit C to Amended Complaint).  Once that contract became public, HHS disclosed that it had also paid conservative columnist Mike McManus $10,000 to assist in promoting Bush administration policy and the President's marriage initiatives.  Siobhan McDonough, <u>Another Columnist Was Paid to Help Bush Administration Agency</u>, *San Francisco Chronicle*, January 29, 2005 (attached as Exhibit D to Amended Complaint).

In light of the questions raised about the use of taxpayer dollars to fund public relations campaigns, the minority staff of the House Committee on Government Reform prepared a report on the Bush administration's public relations spending.  According to that report, in the four-year period from 2001 through 2004, the federal government spent over $250 million on 286 contracts with major public relations agencies.  U.S. House of Representatives Committee on Government Reform – Minority Staff, Special Investigations Division, <u>Federal Public Relations Spending</u>, p. 4 (Jan. 2005) (attached as Exhibit E to Amended Complaint).  The majority of this spending went to four large firms: Ketchum Communications received $97 million in contracts, The Matthews Media Group received $51.6 million in contracts, Fleishman Hillard received $41.1 million, and Porter Novelli received $33 million in contracts.  <u>Id</u>. at 6.

Nearly five months after filing its FOIA request, CREW had received neither a response

to its request nor a time-frame within which HHS would respond. Accordingly, CREW filed its complaint in this matter on June 7, 2005.

Thereafter, by letter dated June 30, 2005, HHS advised CREW that its request for a fee waiver had been denied. See Exhibit G to Amended Complaint. HHS claimed, with no support whatsoever, that CREW is "unlikely to unearth fresh or new ideas that have not already been explored in various media accounts in 2004 or early 2005." Id. HHS also claimed that CREW had not demonstrated "a regular practice of or mechanism for dissemination of information to the public," id., notwithstanding the contrary showing CREW made in its initial request for a fee waiver.

CREW filed an administrative appeal of HHS's initial determination on July 6, 2005, demonstrating that HHS's initial fee determination was wrong as a matter of law and fact. See Exhibit H to Amended Complaint. As CREW explained, "given the wide public attention . . . to government agencies' use of video news releases and other media products created by public affairs firms to promote certain policies of this Administration," disclosure of the requested records regarding HHS's contracts and contacts with such public affairs firms "will contribute significantly to the public's understanding of the individuals and organizations that influence, or attempt to influence, public opinion regarding HHS and its policies and programs." Id.

CREW further demonstrated that it has an established history of using sources such as the FOIA to educate the public and that public dissemination of the kind of information it is seeking here from HHS "is at the heart of what [CREW] does." Id. CREW cited numerous examples, including its recently published report, *Addicted to Porn: How Members of Congress Benefit from Pornography*, that details the campaign contributions that members of Congress have

received from corporations involved in pornography, and a site prepared by CREW and disseminated through CREW's web site that details the many activities of Jack Abramoff, a Washington lawyer and lobbyist currently under criminal investigation, and the many powerful individuals linked to Abramoff.  Id.

CREW also pointed out that, with the exception of HHS, all of the numerous agencies with which CREW has filed FOIA requests for documents relating to those agencies' contracts and contacts with public affairs firms have readily granted CREW's request for a fee waiver and that the present request with HHS should be no different.  Id.

By letter dated July 14, 2005, HHS advised CREW that HHS had made a final decision to uphold the agency's denial of CREW's request for a fee waiver.  Exhibit I to Amended Complaint.  HHS based its determination on its summary conclusion that CREW had not explained how disclosure of the requested records would "reveal meaningful information, the general nature and policy implications of which are not already public knowledge."  Id.  HHS also reiterated its earlier finding, with no supplementation whatsoever, that CREW had not demonstrated how the requested records would shed light on the operations and activities of the Government.  Id.  Finally, HHS clung to its earlier position that CREW had not demonstrated an ability to disseminate the requested information.  Id.  Of note, HHS failed to deal with any of the additional facts and arguments offered by CREW in its appeal of HHS's initial fee determination.

On July 20, 2005, CREW filed an amended complaint to add facts and counts dealing with HHS's denial of CREW's request for a fee waiver.

# ARGUMENT

**CREW HAS DEMONSTRATED AS A MATTER OF FACT AND LAW THAT IT IS ENTITLED TO A WAIVER OF FEES FOR THE PROCESSING OF ITS FOIA REQUEST.**

### A. The Records CREW Seeks Pertain To The Operations And Activities Of The Government and Their Disclosure Would Reveal Meaningful Information About Government Operations or Activities.

Defendant HHS's regulations set forth four factors the agency will consider in determining whether a FOIA requester has satisfied the public interest component of the fee waiver provision. See 45 CFR 5.45(b)(1)-(4). In evaluating CREW's request for a fee waiver, HHS appears to have merged the first two factors, i.e., (1) "[h]ow, if at all, . . . the records to be disclosed pertain to the operations or activities of the Government," and (2) whether disclosure would "reveal **any** meaningful information about government operations or activities." Id. at 5.45(b)(1-2) (emphasis added).[1]

In its initial request and subsequent administrative appeals, CREW explained that the records it is seeking about contacts and contracts HHS had with public relations firms pertain to the operations and activities of HHS, because they will shed light on "the individuals and organizations that influence, or attempt to influence, public opinion regarding HHS and its policies and programs." CREW Appeal Letter of July 6, 2005 (Exhibit H to Amended Complaint). Indeed, it is axiomatic that documents of contracts HHS entered with public relations firms to spend federal funds appropriated to HHS and records of contacts HHS had with

---

[1] In neither its initial decision on CREW's fee waiver request nor its decision on appeal did HHS cite to or identify the four factors set forth in its own regulations. Nor is it clear from what little explanation it offered for its conclusions that HHS even applied each of the four factors. This is yet another reason why HHS's ad hoc conclusions are flawed and must be overturned.

public relations firms concerning those contracts are nothing but about HHS's operations and activities, in this case its contracting activities.  Cf. Landmark Legal Foundation v. IRS, 1998 U.S. Dist. LEXIS 21722 (Sept. 22, 1998), *aff'd on other grounds*, 347 U.S. App.D.C. 370, 267 F.3d 1132 (D.C. Cir. 2001) (even where disclosure standing alone will reveal very little about an agency, fee waiver criteria satisfied if, coupled with publicly available information, the requested records may contribute to understanding of agency's operations or activities).

      HHS does not appear to contest that CREW satisfies the first factor in the public interest test.  Instead, it contends that CREW has not explained "how the records would reveal meaningful information, the general nature and policy implications of which are not already public knowledge."  HHS Appeal Letter of July 14, 2005 (Attachment I to Amended Complaint).  According to HHS, the requested records are "unlikely to unearth fresh or new issues that have not already been explored in various media accounts in 2004 or early 2005."  Id.

      First, as an evidentiary matter, HHS has failed to support its summary conclusions that disclosure of the requested documents would not reveal meaningful information and is unlikely to "unearth fresh or new issues."  There is, for example, no citation to any specific media account or explanation of what has already been publicly revealed.  Instead, HHS has offered only its unsubstantiated speculation that there is nothing more to learn about its contracting activities and how it has obligated federal funds to advance the Administration's policies.

      The record that CREW has put before the Court demonstrates however, that in at least one instance, HHS only came forth with new information about a contract it had with a conservative journalist in the wake of revelations about the Education Department's similar practices and the investigation by the Government Accountability Office into the illegal practice

of funding covert propaganda.  See Siobhan McDonough, Another Columnist Was Paid to Help Bush Administration Agency, *San Francisco Chronicle*, January 29, 2005 (Exhibit D to Amended Complaint).  What is unknown, and what HHS has failed to document, is whether there are other contracts HHS had with public relations firms that HHS has yet to reveal.

Moreover, that some media accounts have touched on HHS's practices of contracting with public relations firms to create covert propaganda "is no substitute for the detailed treatment that is CREW's hallmark in its treatment of issues."  CREW Appeal Letter of July 6, 2005, p. 2.  CREW is not a member of the media, facing publication deadlines and competition from other reporters for limited news space.  Rather, it is a non-profit corporation whose mission is "the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials."  Toward that end, "CREW uses a combination of research, litigation, and advocacy to advance its mission."  Id.  And the products of its labor reflect a careful and thorough analysis.  For example, currently on CREW's web site is a link to a site, prepared by CREW, that provides great detail about the many activities of Jack Abramoff and the individuals linked to Abramoff through such things as campaign contributions.  Id.  It is this type of in-depth and detailed analysis that differentiates CREW's work product from the relatively few news articles already published on the subject of HHS's contracts with public relations firms.

In addition, the fact that HHS characterizes the documents CREW seeks as "of a routine administrative nature,"[2] again without any explanation or substantiation, is not a sufficient basis to deny CREW's request for a fee waiver.  First, it is not at all clear what HHS means by "a

---

[2] HHS Appeal Letter of July 14, 2005.

routine administrative nature," given the context and background to CREW's request.  Contracts that underlie accusations that HHS has improperly engaged in covert propaganda cannot reasonably be termed "routine."  As CREW explained in its appeal, public interest here stems from the use by HHS and other federal agencies of contracts with public affairs firms to procure "video news releases and other media products" that "promote certain policies of this Administration."  CREW Appeal Letter of July 6, 2005, p. 1.  And the amount of money spent by agencies on contracts with public relations firms is far from "routine."  According to a report prepared by the minority staff of the House Committee on Government Reform, in the four-year period from 2001 through 2004, the federal government spent over $250 million on 286 contracts with major public relations agencies.  See U.S. House of Representatives Committee on Government Reform – Minority Staff, Special Investigations Division, Federal Public Relations Spending, p. 4 (Jan. 2005) (Exhibit E to Amended Complaint)  Thus, HHS's summary conclusion that the records CREW seeks are "of a routine administrative nature" is belied by the record, as well as common sense.[3]

     Moreover, as CREW explained in its fee request and subsequent appeals, it is the analysis that CREW will make of these documents that will contribute significantly to the public

---

[3] This conclusion is underscored by the media attention that HHS's contracts have drawn to date. And the overall issue of the government's role in creating covert propaganda continues to be of interest.  Just a few weeks ago, *The Washington Post* published a one-page article about contracts that the Environmental Protection Agency had with the Weather Channel to produce and broadcast videos that advanced "the Bush administration's efforts to inform the public about climate change."  Christopher Lee, EPA Paid Weather Channel for Videos, *The Washington Post*, July 18, 2005 (attached as Exhibit 1).  Of note, the article also quoted Melanie Sloan, Executive Director of CREW, and noted CREW's role in addressing publicly "the administration's public relations practices."  Id.  Thus, this article is also further evidence of CREW's role and success in publicly disseminating the precise kind of information it seeks through its FOIA request here.

understanding of HHS's operations and activities. CREW's publication "could inform members of the public all over the country" about the existence and significance of any contracts HHS has with public affairs firms. Fitzgibbon v. AID, 724 F.Supp. 1048, 1051 n.11 (D.D.C. 1989).[4]

Finally, HHS's determination cannot be squared with its own regulation, which requires that disclosure reveal "**any** meaningful information about government operations or activities." 45 CFR 5.45(b)(2 (emphasis added). That there may be intermingled with the requested records more routine administrative information that, by itself, would not be particularly meaningful does not undermine the necessary conclusion that, as a whole, the requested information will shed significant and meaningful light on the operations and activities of HHS.

### B. CREW Has Demonstrated Its Ability to Disseminate To The Public Newsworthy Information.

HHS also denied CREW's request for a fee waiver because the agency concluded that CREW had not "documented the issue of your ability to disseminate the information that would be released." HHS Appeal Letter of July 14, 2005. According to HHS, CREW does not have a "track record" for publishing "new information that would be of interest beyond a narrow segment of the general population." Id. And HHS faulted CREW for not having a "particularized plan for the analysis and publication of any new information" nor a "particular focus of a search beyond 'all contracts' and 'all contacts.'" Id.

In reaching these conclusions, HHS ignored the contrary evidence before it and appears to have engrafted on its regulations new requirements that have never before been enunciated. The remaining two factors articulated in HHS's regulations are: (3) "Will the disclosure advance

---

[4] In Fitzgibbon, the court overturned the agency's decision to deny the plaintiff a fee waiver because the requested records were already publicly available. As the court recognized, mere public availability is no substitute for the ability to disseminate widely. Id.

the understanding of the general public as distinguished from a narrow segment of interested persons?" and (4) "Will the contribution to public understanding be a significant one?" 45 CFR 5.45(b)(3)-(4). Notably the regulations are silent on the newly minted requirement to present "a particularized plan for the analysis" of the requested information.

In any event, HHS's conclusions cannot be squared with the evidence of record. CREW has demonstrated its ability to disseminate the requested information. As CREW explained, "dissemination of information is at the heart of what [CREW] does." CREW Appeal Letter of July 6, 2005. For example, CREW has published a report that it prepared and that details the campaign contributions that members of Congress have received from corporations involved in pornography. Id. And a review of CREW's web site reveals, among other things, a link to a site that it prepared concerning the activities of Jack Abramoff. Id. CREW was formed for the precise purpose of making the public aware of the activities of government officials; it accomplishes that mission through dissemination of information. Id. It is curious in the extreme, in light of the kind of organization CREW is and its demonstrated "track record" of disseminating publicly the kind of information it seeks here, that HHS would conclude to the contrary.

Moreover, the fact that CREW sought all contracts and contacts with public relations firms and did not focus its request more narrowly is not a legitimate basis to deny its request for a fee waiver. CREW does not know, and HHS does not explain, how CREW could have focused its request more narrowly in a manner that would have better substantiated its claim for a fee waiver. Absent the contracts themselves, CREW has no way of knowing which contracts with public relations firms may have involved illegal covert propaganda. The search is as focused as

possible given what is already known to CREW, i.e., that HHS entered at least some contracts with public relations firms for the creation and publication of news releases that advance the Bush administration's policies. Indeed, given the conclusion of the Government Accountability Office that these kind of activities are illegal and the political firestorm that public revelation of these practices ignited, it would have been ineffective, if not sheer folly, for CREW to more narrowly define which contracts it is seeking.[5]

HHS's determination that CREW has not demonstrated its ability to disseminate information "that would be of interest beyond a narrow segment of the general population" is equally flawed. As an initial matter, HHS is silent on the basis for this conclusion, and its failure to explain adequately its decision is, in and of itself, a basis to reject that decision. Moreover, CREW has demonstrated that it uses a variety of methods to disseminate information, thus guaranteeing such information will reach a wide audience. Beyond its web site, CREW publishes reports and memoranda and documented its intent to do so here to share its analysis of the requested information. See CREW Appeal Letter of July 6, 2005, p. 2. A review of CREW's web site – www.citizensforethics.org – illustrates that CREW has an established history of using the Freedom of Information Act for these very purposes. Id. Had HHS reviewed this material, as CREW requested it to do, id., HHS could not reasonably have come to the conclusion that CREW is not entitled to a fee waiver.

Finally, while not dispositive of this issue, it is certainly noteworthy that all of the other

---

[5] For example, had CREW sought all contracts with public relations firms for the production of covert propaganda, HHS would undoubtedly have claimed it had no responsive records, given the position of the Bush administration that these practices do not constitute covert propaganda, notwithstanding GAO' s contrary conclusions. *See* Christopher Lee, Administration Rejects Ruling on PR Videos, *The Washington Post*, March 15, 2005 (attached as Exhibit B to Amended Complaint).

14

numerous agencies from which CREW has sought the same kinds of documents that it seeks here have readily granted CREW's request for a fee waiver. Id. Indeed, not one has raised a single question about CREW's eligibility for a fee waiver. This case should be no exception.[6]

## CONCLUSION

For the foregoing reasons, CREW's motion for partial summary judgment should be granted and HHS should be ordered to grant CREW a fee waiver.

Respectfully submitted,

___/s/_____
Melanie Sloan
(D.C. Bar No. 434584)
Anne L. Weismann
(D.C. Bar No. 298190)
Citizens for Responsibility and
 Ethics in Washington
11 Dupont Circle, N.W.
Washington, D.C.  20036
Phone: (202) 588-5565
Fax: (202) 588-5020

Attorneys for Plaintiff

Dated: August 1, 2005

---

[6] HHS does not contend that CREW is a commercial requester, and denied CREW's request for a fee waiver after considering only the "public interest" component of the fee waiver requirements. See HHS Appeal Letter of July 14, 2005.