# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | CV-05-1127 (CKK) |
| vs. | ) ) | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES | ) ) ) | |
| Defendant. | ) ) | |

## DEFENDANT'S MOTION FOR A STAY OF PROCEEDINGS

Pursuant to 5 U.S.C. § 552(a)(6)(C)(i) and Open Am. v. Watergate Special Prosecution Force, 547 F.2d 605 (D.C. Cir. 1976), defendant, United States Department of Health and Human Services, by and through its undersigned counsel, hereby move this Court for a stay of proceedings as set forth in the accompanying Memorandum in support of this Motion. Defendant respectfully requests that this Court order defendant to produce all documents, besides the documents from the National Institute of Health ("NIH"), responsive to plaintiff's Freedom of Information Act request on a rolling basis every six weeks, beginning January 26, 2007, and ending on August 10, 2007. For the documents from the NIH, defendant asks this Court to order plaintiff to narrow its request to exclude all contact information or to give defendant until January 26, 2010, to produce all such documents.

Dated November 17, 2006                    Respectively Submitted,

                                           PETER D. KEISLER
                                           Assistant Attorney General

                                           JEFFREY A. TAYLOR
                                           United States Attorney

                                           ELIZABETH J. SHAPIRO
                                           (D.C. Bar 418925)
                                           Assistant Branch Director
                                           U.S. Department of Justice
                                           Civil Division, Federal Programs Branch

                                           /s/ *Adam D Kirschner*
                                           ADAM D. KIRSCHNER
                                           Trial Attorney
                                           U.S. Department of Justice
                                           Civil Division, Federal Programs Branch
                                           Mailing Address
                                           P.O. Box 883
                                           Washington, D.C., 20044
                                           Delivery Address
                                           20 Massachusetts Ave., NW., Room 7126
                                           Washington, D.C. 20001
                                           Telephone: (202) 353-9265
                                           Fax: (202) 616-8470
                                           adam.kirschner@usdoj.gov

                                           Counsel for Defendant

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | CV-05-1127 (CKK) |
| vs. | ) ) | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES | ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF A STAY OF PROCEEDINGS

In response to the joint status report filed on October 13, 2006, this Court ordered defendant United States Department of Health and Human Services ("HHS") to file an *Open America* Motion to Stay proceedings if it could not complete production of plaintiff's FOIA request by January 26, 2007. See October 18, 2006, Minute Order. Considering the broad search that the Citizens for Responsibility and Ethics in Washington ("CREW" or "plaintiff") has asked the entire Department of Health and Human Services to undertake in response to its FOIA request and the other constraints on the time of HHS's FOIA office, defendant is moving for a stay of proceedings pursuant to 5 U.S.C. § 552(a)(6)(C)(i) and Open Am. v. Watergate Special Prosecution Force, 547 F.2d 605 (D.C. Cir. 1976). CREW's FOIA request is not the only FOIA request propounded on HHS. It would be unfair to all other requesters for HHS to have to cease work on their requests because CREW has filed a lawsuit and is unwilling to agree to a rolling production or to find ways to narrow the scope of its request. HHS respectfully asks this Court to grant its motion to stay proceedings and to allow HHS to produce the documents on a rolling

basis. The first production has already occurred,[1] and the second is to occur by January 26, 2006.

HHS asks this Court to order the remaining documents to be produced every six weeks, with the

final production occurring by August 10, 2007. This schedule does not include the documents

from the National Institutes of Health ("NIH"). For those documents, which include

approximately half a million pages, HHS respectfully requests until January 26, 2010, to finish

producing those documents. If CREW is willing to limit the request to a subset of those

documents, HHS may be able to finish production for the NIH documents by August 10, 2007.

## FACTUAL AND PROCEDURAL BACKGROUND

By letter dated January 11, 2005, plaintiff submitted a FOIA request to defendant for

records regarding:

> [A]ny contact, dating from January 1, 2001, that any office of the Department of
> Health and Human Services may have had with any external public affairs firms
> including, but not limited to Ketchum Public Affairs and Fleischman-Hilliard *(sic)*
> Public Affairs. Specifically, [CREW requested] the release of any contracts the
> Department of Health and Human Services may have entered into with any public
> affairs firm. [CREW] further request[ed] records of contacts any Department of
> Health and Human Services employee may have had with any employee of any
> public affairs firm with which the Department of Health and Human Services had
> a contractual relationship.

See Eckert Decl. (attached hereto as Exhibit 1), Attachment 1. Along with that request, CREW

requested a fee waiver. Id. HHS denied that fee waiver on June 30, 2005. See Eckert Decl.,

Attachment 2. In its letter denying the fee waiver, HHS articulated that it was suspending the

processing of CREW's request due to CREW not agreeing "to pay any processing costs." Id.

After CREW's appeal to the agency was denied, the parties briefed the fee waiver issue, cross-

---

[1]On November 16, 2006, HHS sent CREW, by Federal Express, 2,708 pages of
documents. See Eckert Decl. (attached hereto as Exhibit 1), Attachment 5.

moving for partial summary judgment. This Court granted plaintiff's motion for partial summary

judgment on September 8, 2006, and denied defendant's motion. See Dkt. # 21. On October 2,

2006, HHS granted CREW's fee waiver request. See Eckert Decl., Attachment 4. On October

13, 2006, the parties filed a joint status report, with each party proposing how to proceed with the

processing of CREW's FOIA request. See Dkt. #24. This Court ordered HHS to make its first

production by November 17, 2006. See October 18, 2006, Minute Order. Furthermore, the

Court ordered that HHS either move for an *Open America* Motion to Stay by November 17,

2006, or complete production by January 26, 2007. Id. HHS hereby moves for an *Open America*

Stay.

## ARGUMENT

## HHS IS ENTITLED TO A STAY UNDER FOIA

### A.     Legal Standard for a Stay of Proceedings

Understanding the difficulty in meeting the general requirement that an agency is to

respond to a FOIA request within twenty working days of the date of receipt of the request,  5

U.S.C. § 552(a)(6)A)(i), "Congress inserted a special 'safety valve.'" Appleton v. FDA, 254 F.

Supp. 2d 6, 8 (D.D.C. 20003) (quoting Open Am. v. Watergate Special Prosecution Force, 547

F.2d 605, 610 (D.C. Cir. 1976)).  Specifically, Congress provided that "[i]f the Government can

show that exceptional circumstances exist and that the agency is exercising due diligence in

responding to the request, the court may retain jurisdiction and allow the agency additional time

to complete its review of the records." 5 U.S.C. § 552(a)(6)(C)(i).  The safety valve ensures that

the twenty working day deadline is not too rigid and unworkable. See Appleton, 254 F. Supp. 2d

at 8 citing Open Am., 547 F.2d at 610; see also Aguielera v. FBI, 941 F. Supp. 144, 148 (D.D.C.

1996).

The D.C. Circuit defined "exceptional circumstances" as:

> [W]hen an agency . . . is deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of subsection (6)(A), and when the agency can show that it 'is exercising due diligence' in processing the requests.

Open Am., 547 F.2d at 616. "Courts in this circuit have interpreted this 'exceptional circumstances' provision as excusing any delays encountered in responding to a request as long as the agencies are making good-faith efforts and exercising due diligence in processing requests on a first-in, first-out basis." Appleton, 254 F. Supp. 2d at 8 citing Open Am., 547 F.2d at 616; Ohaegbu v. FBI, 936 F. Supp. 7, 8 (D.D.C. 1996).

The Electronic Freedom of Information Act Amendments of 1996 further defined "the term 'exceptional circumstances'" as not including "a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests." 5 U.S.C. § 552(a)(6)(C)(ii). The 1996 Amendments were not meant to overturn Open America but rather "merely explain that predictable agency workload and a backlog alone, will not justify a stay." Al-Fayed v. CIA, No. 00-2092, slip op. at 5 (D.D.C. Jan. 16, 2001, attached hereto as Exhibit 2). Therefore, "a court shall consider an agency's efforts to reduce the number of pending requests in determining whether exceptional circumstances exist." 1996 U.S.C.C.A.N. 3448, 3467.

Besides showing progress in reducing its backlog, agencies can show exceptional circumstances based on the amount of material classified, based on the size and complexity of other requests processed by the agency, based on the resources being devoted to the

declassification of classified material of public interest, or based on the number of requests for records by courts or administrative tribunals. 1996 U.S.C.C.A.N. 3448, 3467; see also The Wilderness Society v. United States Dept. of the Interior, 2005 WL 3276256 at *6 (D.D.C. 2005);[2] Al-Fayed v. CIA, No. 00-2092, slip op. at 5 (D,D,C. Jan. 16, 2001) (Exhibit 2). Another "factor in determining whether exceptional circumstances exist" is whether the requester has refused "to reasonably modify the scope of a request or arrange an alternative time frame for processing a request . . . after being given an opportunity to do so by the agency." See 5 U.S.C. § 552(a)(6)(C)(iii).

Open America recognized that the "real parties at interest" were not the ones before the Court but the "other persons or organizations who made requests prior" to the plaintiff's request. Open Am., 547 F.2d at 614. "If everyone could go to court when his request had not been processed within thirty days, and by filing a court action automatically go to the head of the line at the agency, we would soon have a listing based on priority in filing lawsuits, i. e., first in court, first out of the agency." Id. at 615. Plaintiff is not entitled to make the agency stop its work on all other FOIA requests solely because it filed a lawsuit. Rather, the "plaintiff bears the burden of showing a genuine need and reason for urgency in gaining access to Government records ahead of prior applicants for information." Edmond v. United States Attorney, 959 F. Supp. 1, 3 (D.D.C. 1997) (internal quotations omitted).

---

[2]In that case, the Court denied the *Open America* Stay Motion because "Defendants provide no analysis, statistics, affidavits, declaration or other sworn statement from agency personnel to support this contention" that exceptional circumstances and due diligence exist. The Wilderness Society v. United States Dept. of the Interior, 2005 WL 3276256 at *10 (D.D.C. 2005. In this case, the defendant has supported its contention with a declaration from agency personnel.

**B.    The Department of Health and Human Services More Than Satisfies the Legal Standard for a Stay**

The analysis for an <u>Open America</u> stay comes down to whether an agency has shown good faith and due diligence in processing the request and whether exceptional circumstances exist so as to require the agency to have additional time to finish its processing. <u>See</u> 5 U.S.C. § 552(a)(6)(C)(i). As explained below, the Department of Health and Human Services qualifies for a stay of proceedings under each of the factors relevant to this determination.

### 1.    Due Diligence in Processing the FOIA Request

The Department of Health and Human Services "is exercising due diligence in responding to the request," as required by 5 U.S.C. § 552(a)(6)C)(i). CREW's complex request demands documents from throughout the Department of Health and Human Services. <u>See</u> Eckert Decl., Attachment 1 ("[t]his request relates to any contact, dating from January 1, 2001, that <u>any office of the Department of Health and Human Services</u> may have had with any external public affairs firms") (emphasis added). When a FOIA request pertains to "records of more than one of the Department's primary operating components," the request is processed through the "Freedom Information/Privacy Acts Division, Office of the Assistant Secretary for Public Affairs, Department of Health and Human Services." Eckert Decl. at ¶¶ 3, 1. When a request is received by that office, "the components within which the records are reasonably expected to be located are identified" and "asked to search their records to identify material responsive to request." <u>Id.</u> at ¶ 7. The responsive documents are then "typically forwarded to the [central] office for review and determination of whether the documents should be released or withheld." <u>Id.</u> at ¶ 9. The requests are processed on "a 'first in, first out' basis, in the order in which [the HHS central

-6-

FOIA office] receive documents responsive to the request." Eckert Decl. at ¶ 10. To streamline the process, HHS has exceptions to this policy so as to process as many requests as quickly as possible. For example, "if the requests require less review time and less coordination among HHS components, those tend to be processed sooner than more complex requests." Id. at ¶ 11. In addition, "if the request is for materials already reviewed and released and, therefore, readily available," HHS makes an exception to this first-in, first-out policy. Id.

This is the policy that HHS followed for the instant request.[3] After HHS acknowledged receipt of the request, it immediately "sent the request to all eleven operating components within HHS and the Office of the Secretary because the request demanded documents from throughout HHS." Id. at ¶ 29. For requests that involve multiple components, each component does an initial review of the documents but the central FOIA office must conduct its own review to "ensure that the request is being interpreted consistently by the different components and that the statutory exemptions asserted are being consistently applied." Id. at ¶ 30. For this request, the components had started "gathering documents and reviewing them" and "sent [some of those documents] to the central FOIA office before" HHS denied CREW's fee waiver request on June 30, 2005. Id. at ¶ 31. In denying the fee waiver, HHS also informed CREW that "[s]ince [CREW has] not agreed to pay any processing costs, [its] request has been temporarily suspended, as the search and duplication charges may be substantial." See Eckert Decl., Exhibit 2. This is consistent with HHS' regulations. See 45 C.F.R. § 5.44(b) (the administrative time limits in processing a request "will begin only after [HHS] come[s] to an agreement with [the

---

[3] CREW did not ask for expedited processing, which is another exception to the first-in, first-out policy. See Eckert Decl. at ¶¶ 26, 11.

requester] over payment of fees, or decide[s] that fee waiver or reduction is appropriate."). Still,

"[c]ertain components [] conducted more searches and gathered documents that it deemed as

being potentially responsive [but] [t]he central FOIA office did not process these documents

because of the suspension of the request and the demands of other FOIA requests." Eckert Decl.

at ¶ 35.

The fee waiver issue was resolved with this Court's September 8, 2006, decision to order

the agency to grant CREW a fee waiver. See Minute Order, September 8, 2006. After "HHS

reviewed its various litigation options," the Director of the central FOIA office sent a

"memorandum to all of HHS' components, requesting that they conduct a thorough search and

send to [his] office any documents they deem responsive." Eckert Decl. at ¶ 36. This

memorandum, which was dated on September 29, 2006, was sent even before HHS granted

CREW its fee waiver request on October 2, 2006. Eckert Decl. at ¶¶ 36, 37. The memorandum

also instructed each of the components' FOIA Officers to inform the central office "of the

estimated amount and nature of responsive records" and when those components expected to be

able to forward potentially responsive documents to the central FOIA office. Id. at ¶ 36.

The components have already identified "30,000 pages as potentially responsive." Id. at ¶

38. This does not include the expected "several thousand more pages [that] will be deemed

responsive." Id. Furthermore, it does not include the documents within NIH, which includes

"approximately 500,000 pages of records." Id. at ¶ 39. The NIH documents include an

"estimated 70 contracts/task orders/purchase orders" as well as related contact information. Id.

Components have already sent "approximately 3,000 pages" to the central FOIA office to

process while "an initial review of the [other pages is still needed] to deem if they are actually

responsive and whether any of these documents have statutory exempted material." Id. at ¶ 38. After the documents are sent to the central office, the FOIA specialist assigned to this request "must do a line-by-line and word-by-word review of all responsive documents, handle any pre-disclosure notifications from [the central FOIA office], and propose any suggested redactions." Id. at ¶ 40. Thus far, approximately 2,708 pages have been produced. Id. at ¶ 43; Eckert Decl., Attachment 5. Two components have completed their searches and productions. See id. at ¶ 43. The FOIA specialist has also "been in frequent contact with the HHS operating components regarding the scope of the request" to help facilitate future productions. Id. at ¶ 40.

## 2.  Exceptional Circumstances Exist that Warrant HHS to Have Additional Time to Process CREW's request

To obtain a stay, an agency needs to "show exceptional circumstances exist" in addition to showing "that the agency is exercising due diligence in responding to the request." 5 U.S.C. § 552(a)(6)(C)(i). HHS meets the standard for "exceptional circumstances" because it is being "deluged with a volume of requests for information vastly in excess of that anticipated by Congress" and its "existing resources are inadequate to deal with the volume of such requests within the time limits" of the statute. See Open Am., 547 F.2d at 616. Furthermore, HHS has attempted to "modify the scope of the request" and proposed "an alternative time frame for processing the request." See 5 U.S.C. § 552(a)(6)(C)(iii). In addition, the other requests processed by the central FOIA office of HHS are complex because they often involve the coordination of responses from multiple components within HHS. See 1996 U.S.C.C.A.N. 3448, 3467 ("[a]gencies may also make a showing of exceptional circumstances . . . based on the size and complexity of other requests processed by the agency"). Another pull on the resources of the

-9-

central FOIA office has been the number of lawsuits to which it has been a party. See id. at 3468 (another consideration of whether exceptional circumstances exist is "based on the number of requests for records by courts or administrative tribunals"). Finally, defendant has attempted to reduce the annual backlog that has arisen due to unpredictable circumstances. See id. at 3467 ("a court shall consider an agency's efforts to reduce the number of pending requests in determining whether exceptional circumstances exist").

Over the last several years, the HHS central FOIA office has been deluged with a great number of requests and the resources that they have to respond to those requests are inadequate. From 2001 through 2003, the central FOIA office received an average of approximately 985 requests a year. See Eckert Decl. at ¶¶ 13-15. However, in 2004 and 2005, the office received, on average, approximately 1236 requests annually. Id. at ¶¶ 16-17. In fact, HHS processed approximately 2083 requests during those latter two years, which is just more than 1040 a year and more than the total number of requests that HHS received during any of the previous three years. See id. at ¶¶ 13-17. In FY 2006, the number of requests declined but it was still more than 800 in total. Id. at ¶ 18. The decline in FY 2006 was because the central office stopped being directly responsible for the FOIA requests made to the Administration for Children and Families ("ACF"). See id. Even though there was a decline in the number of requests for which the central FOIA office was responsible, the "office was still responsible for the complicated department-wide requests during FY 2006." Id.

The resources to deal with these large and complicated requests have been inadequate during the past several years, in some ways because of unexpected circumstances. The office had an unexpected absence of its Director for much of 2003 due to the illness and death of his wife.

-10-

Id. at ¶ 15. He ultimately retired in 2005, causing the current Director to simultaneously "process [his] FOIA assignments" and to take care of his "managerial responsibilities" for several months. Id. at ¶ 17. The current Director's previous position as FOIA analyst was filled in spring of 2006. Id. The office had "a long-term staff vacancy" from July 2005, through April 17, 2006. Id. at ¶ 19. Furthermore, even a fully staffed office was deemed inadequate; the Director of the FOIA office was able to hire an additional FOIA analyst in 2006 in response to Presidential Executive Order 13,392 (Improving Agency Disclosure of Information). Id. at ¶ 21.

The inadequate resources are further compounded by the fact that in addition to the processing of the FOIA requests, the Freedom of Information/Privacy Acts Division has many responsibilities. These include providing "FOIA policy and processing oversight, training, and guidance for the entire Department," as well as "processing, administration, and coordination of Privacy Act systems of records notices, Privacy Act requests, and other Privacy Act issues throughout the Department." Id. at ¶ 4; see also id. at ¶ 41 (stating the other responsibilities required of the FOIA specialist assigned to CREW's request). Furthermore, the Director of the central office spent much of his "time during the first six months of 2006" implementing a FOIA Improvement Plan pursuant to Executive Order 13,392. Id. at ¶ 21. This "Plan includes specific activities to eliminate or reduce the FOIA backlog, changes to streamline FOIA processing, and specific activities to increase public awareness." Id. Given the demands on the time of the Freedom of Information/Privacy Acts Division of HHS and the large number of requests it receives, the office has had inadequate resources to meet the time-line contemplated by Congress to process each FOIA request.

One of the ways the central HHS FOIA office is trying to deal with all of its

-11-

responsibilities is by "increasing contacts between FOIA specialists and the requesters so that the requesters could narrow the scope of broad requests," and, thereby, "enabling the requesters to get the materials they are seeking and [allowing the FOIA office] to process the requests more quickly." Id. at ¶ 24. This is consistent with one of the factors to consider in whether exceptional circumstances exist: "[r]efusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) . . . after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist." See 5 U.S.C. § 552(a)(6)(C)(iii). In the instant case, HHS proposed to limit the scope of the search and proposed an alternative time frame for processing the request but CREW refused with regards to both proposals. As articulated in the Joint Status Report, "[m]ost of the components within HHS do not track contracts by the nature of the contractor's business." See Dkt. #24 at 4; Eckert Decl. at ¶ 44. Therefore, "HHS proposed that CREW identify a list of public affair firms for which they would like HHS to search." See Dkt. #24 at 5; see also Eckert Decl. at ¶ 49. Furthermore, HHS proposed that "CREW may not be interested in any material protected by Exemption 4 of FOIA" because of the time-consuming nature of the pre-disclosure notification required to protect outside parties' proprietary information. See Dkt. #24 at 5; see also Eckert Decl. at ¶ 44. On both accounts, CREW refused. It stated that it was unwilling to confine its request to certain public affairs firms. See Dkt. #24 at 5. As for the Exemption 4 material, CREW stated that it needed to know "what the categories of proprietary information are," even though the category is obviously outside parties' proprietary information relating to public affairs contracts. See Dkt. #24 at 4.

-12-

Besides rejecting opportunities to help limit the scope of the search and to facilitate processing of the request, CREW also rejected an alternative time frame that HHS proposed. In fact, HHS even "proposed to CREW two alternative schedules." See Dkt. #24 at 5. Both were variations of a rolling production. They both had the first production be on November 17, 2006, and the second production on January 26, 2006. Id. The difference was that one version called for a status report after the two productions "to assess the progress HHS is making in processing the request" while the other called for the production of documents "every 6 weeks" for an anticipated 8 months. Id. CREW rejected these alternative time-lines. CREW did not make any reasonable counterproposal to HHS' efforts to limit the scope of the request to HHS' proposed rolling production schedule. HHS should not be prejudiced by CREW's unwillingness to cooperate with the agency. Therefore, CREW's unreasonable refusal to modify its request or to agree to an alternative time-line is a factor in considering whether exceptional circumstances exist.

HHS also meets other factors a Court is to consider to determine whether exceptional circumstances exist. One of the factors is the "the size and complexity of other requests processed by the agency." See 1996 U.S.C.C.A.N. 3448, 3467. The Freedom of Information/Privacy Acts Division within the Office of the Assistant Secretary for Public Affairs is responsible for coordinating "FOIA requests that involve more than one major component of HHS." See Eckert Decl. at ¶ 4. As with this request, these other requests involve ensuring that "the request is being interpreted consistently by the different components and that the statutory exemptions asserted are being consistently applied." Id. at ¶ 30. The office is responsible for conducting its own review of the documents for these types of request to ensure that the agency is

consistently interpreting the request and the underlying exemptions. See id. Furthermore, these department-wide searches are very complicated because of "the decentralized nature of HHS and its components and sub-components." See id. at ¶ 44. The central office has "no direct line authority over those components' staff." Id. Furthermore, "there is no one HHS automated database that can be used to search for potential responsive documents" but "[r]ather, many databases, logs, and staff need to be consulted within each component." Id. These complex requests are the purview of the central HHS FOIA office, the office responsible for coordinating the response to CREW in this instance.

The office's resources have also been diverted by litigation. See 1996 U.S.C.C.A.N. 3447, 3468 (another consideration of whether exceptional circumstances exist is "based on the number of requests for records by courts or administrative tribunals"). In 2006, the office was responsible for "ten FOIA litigations." See Eckert Decl. at ¶ 22. Litigation involves "frequent consultations with the Office of the General Counsel, more needed documentation regarding how the request was handled, as well as [] work on agency declarations and any necessary Vaughn indices." Id.

In determining whether exceptional circumstances exist, a Court is also to consider the "agency's efforts to reduce the number of pending requests in determining whether exceptional circumstances exist." See 1996 U.S.C.C.A.N. 3448, 3467; see also The Wilderness Society v. United States Dept. of the Interior, 2005 WL 3276256 at *6 (D.D.C. 2005). The Director of the central HHS FOIA office "has been proactive in [his] efforts to reduce the backlog." See Eckert Decl. at ¶ 24. The Director has spent considerable time during 2006 to implement the HHS FOIA Improvement Plan. See id. at ¶ 21. In addition to creating "specific activities to increase

-14-

public awareness," the Plan includes ways to help reduce the backlog and streamline the process. Id. Some of these efforts include hiring new staff, filling a vacant senior position, ensuring that requesters still want material that had not yet been processed, streamlining the process by organizing the request at the beginning in an effort to process the requests in a more timely manner, being in constant communication with the FOIA Coordinators to discuss any issues that may arise, and being in constant communication with the requesters to help limit the scope of the request to enable that the requests be processed faster but yet still give the requesters the materials they desire. Id. at ¶ 24.

Finally, in spite of the inadequate resources that HHS has had to reduce its backlog, it has also shown some success in reducing the predictable workload. However, the workload has not been entirely predictable over the past five years. See 5 U.S.C. § 552(a)(6)(C)(ii) (exceptional circumstances do not include "a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests") (emphasis added). Furthermore, reasonable progress in reducing a backlog "does not require that annual backlog reductions be uniform." Appleton, 254 F. Supp. 2d at 10. The Appleton Court, for example, did not find it problematic that the agency's backlog "decreased by increasing smaller margins from fiscal year 1998 to fiscal year 2001, and actually increased by 971 requests in fiscal year 2000." Id. at 10 n.4.

HHS did reduce its backlog in FYs 2001 and 2002. See id. at ¶¶ 13, 14. In FY 2003, the backlog increased but it was due to unpredictable reasons. See id. at ¶ 15. The major factor in the increase in the backlog was that the "former Director of the Freedom of Information/Privacy Acts Division was out for at least two extended period due to his wife's illnesses and death in

July 2003." Id. For FY 2004, the number of requests unpredictably increased by 330 over the previous year. See id. at ¶¶ 15, 16. However, HHS processed approximately 100 more requests that year than it did in any of the previous three years. See id. at ¶¶ 13-16. The FOIA office had to respond to these requests with the same staff that it had in place during the previous three years when the number of requests was much fewer than they were in FY 2004. See id. at ¶ 16.

The backlog did increase in FYs 2005 and 2006 but Appleton instructs that reasonable progress "does not require that annual backlog reductions be uniform." See Appleton, 254 F. Supp. 2d at 10 n.4 (finding an increase of 971 requests in the backlog not to be problematic). The reasons for the increase in 2005 and 2006 can be explained by other demands on the FOIA office's time. First, there was a long-term vacancy that arose during this period that were not filled until the spring of 2006. See Eckert Decl. at ¶ 19. Second, the FOIA office has been involved in much litigation, ten in FY 2006 alone, which has taken away many valuable resources. See id. at ¶ 22. Finally, the Director of the central FOIA/Privacy Acts Office has spent considerable time working on the FOIA Improvement Plan. See id. at ¶ 21. Ultimately, this plan will help reduce the backlog, but the immediate impact was to divert resources within the FOIA office. See id. ("[c]oordinating the review of agency operations and drafting the FOIA Improvement Plan took up a significant part of the [the Director's] time during the first six months of 2006"). However, the Plan is already having a positive effect, with the addition of another staff person to the central FOIA office. See id. With the introduction of the FOIA Improvement Plan, the central FOIA office of HHS is working diligently to reduce its backlog.

**C.    The Department of Health and Human Services needs until August 10, 2007, to process CREW's request[4]**

CREW's request is very complicated and involves the coordination of many components within the Department of Health and Human Services. The processing of the request ceased during the litigation over the fee waiver issue and only restarted at the end of September 2006. See Eckert Decl. at ¶¶ 31-36, 44. The request has to be processed through the central office to ensure that the response is consistent throughout the Department. See id. at ¶¶ 9, 30, 44. Furthermore, this request is particularly difficult because the subject-matter involves public affairs firms and "[m]any HHS components do not track contractors by the nature of their business." See id. at ¶ 44. This request also involves materials that sometimes lead to the protracted process of pre-disclosure notification, as dictated by Exemption 4 of FOIA, to outside contractors. Id. Finally, the office has other demands on its time, not to mention the demands of other FOIA requests. The agency estimates it will need eight months to complete the processing. See id. at ¶ 45.

The NIH documents are more complicated. They may involve 500,000 pages of documents if CREW does not limit the scope of its request. See id. at ¶¶ 39, 45. However, if CREW elects to receive only the Statements of Work and the contract awards, then HHS could narrow the amount of responsive pages. See id. at ¶¶ 39, 45. By limiting it to those documents, HHS could produce the NIH documents in the same time-period, eight months. Id. at ¶ 45. Otherwise, it would need three to five years to finish the processing. Id. at ¶ 39.

---

[4]If CREW is not willing to limit the scope of its request for NIH documents, then HHS needs until August 10, 2010, to finish processing those documents.

-17-

## **CONCLUSION**

For the reasons set forth above, this Court should grant Defendant's Motion for a Stay of

Proceedings.


Dated November 17, 2006                              PETER D. KEISLER
                                                     Assistant Attorney General

                                                     JEFFREY A. TAYLOR
                                                     United States Attorney


                                                     ELIZABETH J. SHAPIRO
                                                     (D.C. Bar 418925)
                                                     Assistant Branch Director
                                                     U.S. Department of Justice
                                                     Civil Division, Federal Programs Branch


                                                     /s/ *Adam D Kirschner*
                                                     ADAM D. KIRSCHNER
                                                     Trial Attorney
                                                     U.S. Department of Justice
                                                     Civil Division, Federal Programs Branch
                                                     Mailing Address
                                                     P.O. Box 883
                                                     Washington, D.C., 20044
                                                     Delivery Address
                                                     20 Massachusetts Ave., NW., Room 7126
                                                     Washington, D.C. 20001
                                                     Telephone: (202) 353-9265
                                                     Fax: (202) 616-8470
                                                     adam.kirschner@usdoj.gov

                                                     Counsel for Defendant


-18-