UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY )
AND ETHICS IN WASHINGTON, )
                                             )
            Plaintiff, )
                                             )
     v. )     Civil Action No. 05-1127
                                             )
UNITED STATES DEPARTMENT OF )
HEALTH AND HUMAN SERVICES, )
                                             )
           Defendant. )
                                             )

## DECLARATION OF ROBERT ECKERT

I, Robert Eckert, declare as follows:

1. I am the Director of the Freedom of Information/Privacy Acts Division, Office of the Assistant Secretary for Public Affairs, Department of Health and Human Services (HHS, or the Department). In this capacity, I am the Freedom of Information Officer for the Department. I have been with the Division since December 2000, and served as a Senior Public Affairs Specialist. I became the Director of the Division in October 2005. Before joining HHS, I worked at the U.S. Fish and Wildlife Service, U.S. Department of the Interior, as a Human Resources Management Specialist for 5 years, and before that for 4 years as the Freedom of Information Act (FOIA) Coordinator for U.S. Bureau of Mines, Department of the Interior. I have over 31 years of Federal service.

2. The Freedom of Information/Privacy Acts Division is responsible for providing policy oversight and guidance concerning all FOIA activities within HHS. It also has direct responsibility for processing and responding to requests for records maintained within the Office of the Secretary (OS), any of its staff divisions, and those which are maintained by more than one

HHS component.

3. My duties include responding to requests under the FOIA for records of the Department's Office of the Secretary, and to those requests for records of more than one of the Department's eleven primary operating components. These components are the Administration for Children and Families (ACF), Administration on Aging (AoA), Agency for Healthcare Research and Quality (AHRQ), Centers for Disease Control and Prevention/Agency for Toxic Substances and Disease Registry (CDC/ATSDR), Centers for Medicare and Medicaid Services (CMS), Food and Drug Administration (FDA), Health Resources and Services Administration (HRSA), Indian Health Service (IHS), National Institutes of Health (NIH), Office of Public Health and Science/Program Support Center (OPHS/PSC), and Substance Abuse and Mental Health Services Administration (SAMHSA). Each of these organizational components has its own autonomous FOIA Officer who handles most requests for its records, including whether to release or deny records. However, my office often coordinates the release of records if the records are from multiple HHS components. My duties include determining whether to release or withhold records, or portions of records, in accordance with the FOIA and the HHS regulations implementing the FOIA. For requests processed through my office, the activities include:

a. maintaining an orderly log of all FOIA requests received for the above described kinds of records;

b. referring requests to the appropriate offices within HHS for collection of documents requested;

c. preparing replies to requesters;

  d. drafting briefing materials and responses to administrative appeals and denial decisions;

  e. consulting with the Office of General Counsel regarding responses to appeals of initial decisions and on questions of FOIA case law;

  f. providing guidance for FOIA Officers and coordinators in HHS component offices; and

  g. maintaining accurate records of any charges levied for FOIA search, copying, and/or review activities connected with any request for which my office prepares a response.

4. In addition to processing FOIA requests, my office handles processing or review of all HHS FOIA appeals, and has responsibility to provide FOIA policy and processing oversight, training, and guidance for the entire Department. In addition, my office coordinates FOIA requests that involve more than one major component of HHS. Furthermore, my office has responsibility for processing, administration, and coordination of Privacy Act systems of records notices, Privacy Act requests, and other Privacy Act issues throughout the Department. This means that for much of the past year, analysts in my office have each been responsible for hundreds of new (initial) FOIA requests, hundreds of existing (initial) FOIA requests, and dozens of new and backlogged FOIA and Privacy Act appeals, as well as handling other HHS-wide FOIA policy/administrative and Privacy Act policy/administrative demands. This is an enormous workload, as requests routinely require coordination with Office of the Secretary organizational components and one or more HHS components.

5. I make this declaration based on my personal knowledge and on information I received in the performance of my official duties.

HHS Procedures for Processing FOIA Requests

6. The HHS FOIA regulations are found at 45 C.F.R. part 5. HHS' procedures for processing FOIA requests, which are consistent with the HHS FOIA regulations, are as follows.

7. When a request for records is received by my office, the components within which the records are reasonably expected to be located are identified. Those components are asked to search their records to identify material responsive to the request.

8. With regard to records which are exclusively those of one of HHS' major operating components, the FOIA Officer for that component makes the initial determination to release or deny the records and directly notifies the requester.

9. When responsive records are found within the Office of the Secretary, or in more than one major operating component, responsive documents are typically forwarded to my office for review and determination of whether the documents should be released or withheld. The requester is notified of the agency's release determination by letter. I issue this letter as the Department's FOIA Officer.

10. My office processes requests on a "first in, first out" basis, in the order in which we receive documents responsive to the request. When we receive a FOIA request, we immediately send it to the agency's components that may have responsive records for a search. Due to the size or complexity of certain requests, we may receive responsive

records for more simpler requests before receiving documents for complex requests that were filed beforehand. In those situations, we process the simpler requests first so as not to delay the processing of all FOIA requests until we receive the records for the more complex requests.

    11. Exceptions to the "first in, first out" policy are made if the request is for materials already reviewed and released for another, similar FOIA request and, therefore, readily available; if the request requires less review time and less coordination among HHS components, those tend to be processed sooner than more complex requests; if there are court deadlines to meet in litigations where the agency is a party; or if the requester asks for and is granted "expedited" processing as provided in the FOIA.

Exceptional Circumstances and Efforts to Improve FOIA Operations

    12. The delay in processing FOIA requests in my office is not the result of normal agency workload demands of FOIA requests. There are several contributing factors, which I explain in this section. We are working diligently to improve FOIA operations in our office.

    13. My office in FY 2001 had a backlog of 325 requests pending at the end of FY 2000. We received 1032 requests in FY 2001. We completed processing 1042 request in FY 2001, reducing the backlog.

    14. My office in FY 2002 had a backlog of 315 requests pending at the end of FY 2001. We received 945 requests in FY 2002. We completed processing 968 requests in FY 2002, reducing the backlog.

    15. My office in FY 2003 had a backlog of 292 requests pending at the end of FY

2002. We received 979 requests in FY 2003. We completed processing 909 requests in FY 2003. After following two years of reducing the backlog, we suffered an increase in the backlog in FY 2003. In FY 2003 a major factor, if not the major factor, was that the former Director of the Freedom of Information/Privacy Acts Division was out for at least two extended periods due to his wife's illnesses and death in July 2003. Although I do not know the precise dates, he was absent, I believe, for approximately two months in the late fall 2002 into early 2003, and then again from around mid-May through mid-September 2003 during her last illness and after her death. During his absence, I served as Acting Director for these extended periods while simultaneously attempting to process my own FOIA assignments. As a result of managerial responsibilities during a significant part of FY 2003, I could not devote myself full-time to processing FOIA requests. In addition, my office received an increased number of Privacy Act issues that year.

16. My office in FY 2004 had a backlog of 362 requests pending at the end of FY 2003. We received 1309 requests in FY 2004 and were able to complete the processing of 1148 requests that year. Even though we had no increase in staff during that time, we were able to process more requests in FY 2004 than in the previous fiscal year.

17. My office in FY 2005 had a backlog of 523 requests pending at the end of FY 2004. We received 1,163 requests in FY 2005 and completed processing 935 requests in FY 2005. In FY 2005, the long-serving Director of our office retired, and I became the Acting Director for several months, and then I became the Director, while at the same time trying to process my FOIA assignments. It was not until April 17, 2006, that my former position as a FOIA analyst was filled by a new employee. Due to my managerial

6

responsibilities, I could not devote myself full-time to processing FOIA requests.

18. We received 843 requests in FY 2006. For FY 2006, we have only very preliminary statistics about the number of requests processed. According to these preliminary statistics, we processed approximately 565 requests. The decrease in the number of requests during FY 2006 is explained by my office no longer being responsible for directly processing FOIA requests for the Administration for Children and Families (ACF). Up to April 2005, my office handled all ACF FOIA requests directly because ACF did not have its own FOIA Office. A request made to ACF was simpler than the typical request made to my office even though they often involved grant applications of hundreds or thousands of pages. The ACF requests typically involved the review and redaction of primarily repetitive privacy-exempt material, and did not involve the more complex coordination of multiple Office of the Secretary organizational components and department-wide components. My office was still responsible for the complicated department-wide requests during FY 2006.

19. From the end of July 2005 through April 17, 2006, my office had a long-term staff vacancy after the Director retired, which contributed to the current backlog. Before his retirement, my office had a FOIA Officer who managed the office and reviewed final FOIA responses; two full-time staff members who processed FOIA requests; one full-time staff member who worked primarily on HHS-wide Privacy Act issues and matters including policy, review of all HHS new and revised Privacy Act systems of records notices, Office of the Secretary Privacy Act requests, and FOIA Appeals; and one full-time administrative support staff member who handled the logging-in and tracking of new

FOIA requests and FOIA administrative appeals in addition to general office administrative duties. In January 2007, this administrative support staff member will retire, and the office will suffer another vacancy of the sole position that provides clerical and administrative support work.

20. As the HHS FOIA Officer, I have sought staff increases in my office and to fill vacant positions. My office added a third staff analyst to process FOIA requests on May 15, 2006.

21. Presidential Executive Order 13,392 (Improving Agency Disclosure of Information), issued at the end of Calender Year 2005, required Executive Branch agencies to reform their FOIA programs to be more citizen-centered. The Executive Order required a review of agency FOIA operations and the implementation of a FOIA Improvement Plan. The HHS Plan includes specific activities to eliminate or reduce the FOIA backlog, changes to streamline FOIA processing, and specific activities to increase public awareness. Coordinating the review of agency FOIA operations and drafting the FOIA Improvement Plan took up a significant part of my time during the first six months of 2006. Both the review and the plan assisted me in assessing the workload and needs of my office. In my immediate office, the assessment of staffing requirements assisted in supporting the increase in the number of analysts to four, one of which is primarily devoted to Privacy Act work.

22. My office also handled the processing of FOIA requests and follow-up inquiries, as well as requests for agency declarations, for at least ten FOIA litigations during FY 2006. My office experienced an unpredicted, heavy litigation burden in FY

8

2006, because one requester had filed multiple requests with our Department and has filed three separate FOIA lawsuits against the Department. Litigation presents a significant use of staff resources. Specifically, the frequent consultations with the Office of the General Counsel, more needed documentation regarding how the request was handled, as well as our work on agency declarations and any necessary Vaughn indices, add to the amount of time it takes to process the underlying FOIA request. Litigation diverts the time and resources of my staff from processing the other FOIA requests.

23. As the above paragraphs demonstrate, several factors contribute to the backlog in my office, which include: (1) the complex, time-intensive, and voluminous nature of many of the FOIA requests; (2) the sheer number of the requests; (3) the need to provide original submitters notice when confidential commercial or financial data may be at issue; (4) an increase in requests involving litigation; (5) the need to frequently provide detailed, line-by-line, word-by-word review of material located that may be responsive to FOIA requests; (6) complicated coordination of many requests, which require substantive research and work involving multiple offices across the Department; (7) an increased and more complex workload that exceeds staff resources, such as increasing Privacy Act work and the additional time needed for program improvement activities; and (8) an extended staff vacancy.

24. I have been proactive in my efforts to reduce the backlog in my office, including: (1) hiring one new staff position; (2) filling a vacant senior FOIA specialist position; (3) initiating a practice of verifying whether requesters of older FOIA requests remain interested in receiving responses to their requests; (4) streamlining processing of

FOIA requests by performing intensive initial reviews of the requests, including providing detailed case handling instructions for the FOIA specialists and determining all the potential components with responsive records so as to prevent delayed searches of newly identified responsive components; (5) initiating regular meetings with Office of the Secretary FOIA Coordinators to discuss issues and coordinate actions; and (6) increasing contacts between the FOIA specialists and the requesters so that the requesters could narrow the scope of broad requests, enabling the requesters to get the materials they are seeking and us to process the requests more quickly.

Processing of the Instant Request

25. The requester submitted a FOIA request, dated January 11, 2005, which stated:

> This request relates to any contract, dating from January 1, 2001, that any office of the Department of Human Services may have had with any external public affairs firms including, but not limited to Ketchum Public Affairs and Fleischman-Hilliard Public Affairs. Specifically, we request the release of any contracts the Department of Health and Human Services may have entered into with any public affairs firm. We further request records of contacts any Department of Health and Human Services employee may have had with any employee of any public affairs firm with which the Department of Health and Human Services had a contractual relationship. See Attachment 1.

26. The requester did not ask for expedited processing.

27. The requester asked for a waiver of fees.

28. After HHS received the FOIA request, it acknowledged receipt of the request to the requester.

29. My office sent the request to all eleven operating components within HHS and the Office of the Secretary because the request demanded documents from throughout HHS. This was done immediately upon receipt, and logging in, of the

request.

30. Because this request covers the entire agency, my office is responsible for sending out any responsive documents to the requester. My office also must ensure that the request is being interpreted consistently by the different components and that the statutory exemptions asserted are being consistently applied. Therefore, my office must review all documents before they are sent to the requester.

31. Before the requester's fee waiver was denied on June 30, 2005, the components started gathering documents and reviewing them. Some of those documents were sent to the central FOIA office before the denial of the fee waiver.

32. Because of the demand of other FOIA requests, other FOIA litigations, and the backlog within the HHS FOIA office, no documents were processed in my office before the June 30, 2005, fee waiver denial.

33. When HHS denied CREW's fee waiver, it stated that since CREW had not agreed to pay any processing costs, its request had been temporarily suspended, as the search and duplication charges may be substantial. See Attachment 2.

34. CREW appealed the fee waiver denial in a letter dated July 6, 2005, and the Department denied the appeal in a letter dated July 14, 2005. See Attachment 3.

35. Even though the request had been temporarily suspended, certain components still conducted more searches and gathered documents that it deemed potentially responsive. The central FOIA office did not process these documents because of the suspension of the request and the demands of other FOIA requests. My office's FOIA specialists were processing other FOIA requests in an effort to be productive, avoid future litigation with these other requesters, and provide responses to as many requesters as

11

possible. Working on this one request would have increased the backlog without justification and would have been a disservice to our other FOIA requesters.

36. After this Court's September 8, 2006 order, HHS reviewed its various litigation options. On September 29, 2006, I sent a memorandum to all of HHS' components requesting that they conduct a thorough search and send to my office any documents they deem responsive. We instructed the HHS components' FOIA Officers to inform my office of the estimated amount and nature of responsive records, and the dates when records, with initial review for exempt material completed, would be forwarded to my office. We asked that the search and review be accomplished as soon as possible.

37. Pursuant to the Court's September 8, 2006 order, we issued a grant of the fee waiver request on October 2, 2006. See Attachment 4.

38. To date, the components have identified over 30,000 pages as potentially responsive. The search is not yet complete, and we expect that at least several thousand more pages will be deemed responsive because components are still searching for records and because of the broad nature of the request (specifically, the request for "any contacts" with public affairs contractors). The different components need to do an initial review of these documents to deem if they are actually responsive and whether any of these documents have statutory exempted material. My office has received approximately 3,000 pages thus far. For documents identified by the respective component as responsive, my office must review them for responsiveness and statutory exemptions and determine if any of these documents require pre-disclosure notification. This request concerns contracts, among other things, so some of the responsive records contain material protected by FOIA Exemption 4. In those situations, we may have to provide

pre-disclosure notification to the submitter in accordance with our FOIA regulation at 45 C.F.R. § 5.65.

39. The above paragraph does not apply to NIH records. While preparing this declaration, I learned from NIH that it has an estimated 70 contracts/task orders/purchase orders that may be responsive to the FOIA request. The estimated page count for these records is 1,300 pages. For records of contacts with those 70 or so awards, NIH estimates that it has approximately 500,000 pages of records. NIH's estimate of 1,300 pages is just for the approximately 70 contracts/task orders/purchase orders. NIH's estimate of 500,000 is for all the "contact" records that would be associated with these contracts. NIH's estimate to find, copy, review, and produce all the records is 3-5 years. It would be most efficient if NIH could produce the awards or Statements of Work first and let the requester choose the ones for which they want records of contacts.

40. The FOIA specialist assigned to this request must do a line-by-line and word-by-word review of all responsive documents, handle any pre-disclosure notifications from my office, and propose any suggested redactions. The analyst in this case has already performed a review of approximately 3,000 pages responsive to this request. She has been in frequent contact with the HHS operating components regarding the scope of the request. The specialist has a current caseload of approximately 240 FOIA requests and appeals.

41. The FOIA specialist handling this request has many responsibilities besides processing FOIA requests. She is also responsible for redesigning and updating the HHS FOIA web page by December 2006 to meet HHS' goals, which were developed in response to the requirements of Executive Order 13,392 for improving the agency's FOIA

operations. The analyst also handles Privacy Act issues, including complying with the Fiscal Year Quarterly Reporting Requirements regarding the Federal Information Security Management Act (FISMA). For the Office of Management and Budget's September 1, 2006, revised quarterly FISMA reporting requirements, the analyst coordinated a redesign of the HHS FOIA web page to include direct links to the HHS operating components' posting of Privacy Impact Assessments (PIAs); and, for the December 1, 2006, fourth quarter reporting date, the specialist is working with the HHS' Web Communication Division to post and link all Privacy Act system of records notices (SORNs) on the FOIA web page. Each HHS operating component is expected to create a SORNs posting web page by November 13, 2006. The specialist expects to dedicate three full working days between November 13, 2006, and December 1, 2006 to accomplishing the SORNs postings. She also has six days of annual leave scheduled in December 2006, and January 2007.

42. I will be the final reviewer of the proposed response to the requester and will be the one who issues the final agency response to this request.

43. As of the date of this declaration, we have released approximately 2,708 pages including about 1,324 from CDC; about 1,160 from CMS; about 136 from HRSA; and about 88 from AHRQ. The released AHRQ pages are all the responsive records from AHRQ. IHS found no responsive records. We anticipate after November 17, 2006, to begin receiving and processing records from the other six components of HHS, as well as receiving further records, if any, from CDC, CMS, and HRSA. See Attachment 5.

14

Estimate for Completing Processing of the Request

44. The processing of the request at issue in this litigation has been complicated for the following reasons: (1) Due to the fact that the requester did not agree to pay the fees, my office halted the processing of the request, consistent with the HHS FOIA regulation, until the fee waiver issue was decided by the Court; (2) This request is extremely broad and burdensome. It involves a department-wide search, which is very difficult due to the decentralized nature of HHS and its components and sub-components. I am dependent on the work of the various components processing this request and have no direct line authority over those components' staff. Also, there is no one HHS automated database that can be used to search for potential responsive documents. Rather, many databases, logs, and staff need to be consulted within each component to carry on the search. The components have to contact numerous offices within their components to help ensure that HHS identifies all potentially responsive documents. Many HHS components do not track contractors by the nature of their business, such as public affairs firms; (3) HHS has identified over 30,000 pages as potentially responsive and the search is ongoing; (4) NIH has estimated that it might have to review approximately 500,000 pages to determine if they are responsive to the requester's broad request for any "contacts" with public affairs firms; (5) My office has to coordinate this department-wide request to ensure that the response is consistently applied throughout the agency. This request involves extensive coordination involving the scope of the request, the search for potential documents, the review of documents, and the delivery of those documents to my office; (6) The request seeks contracts, among other things, which

15

sometimes require pre-disclosure notification to the contractors if we determine that there is information that may be protected by FOIA Exemption 4 and if we are considering releasing that information. This can be a very time-consuming process because the submitters of the information may have objections that the agency needs to evaluate; (7) In an effort to process the request more quickly, the agency asked CREW to identify a list of public affair firms for which they would like HHS to search. CREW rejected this offer to narrow the request; (8) In a further effort to process the request more quickly, the agency sought to limit pre-disclosure notifications by asking the requester to eliminate Exemption 4 materials from the request. CREW rejected this offer as well; (9) There will be staff absences during the holiday season at the end of this year; (10) In January 2007, my office will be working on the Annual FOIA Report for FY 2006, which has been expanded to address FOIA Improvement Plan progress for FY 2006; and (11) Upon the loss of my office's sole support staff member in early January 2007, I will need to recruit for and interview candidates, which may involve an extended period of time to fill the vacancy.

45. For the reasons discussed above, we estimate that we will need eight months from the date of this declaration to complete processing the FOIA request for all records, except NIH records. With respect to NIH records, we propose that it would be most efficient if NIH could produce the awards or Statements of Work first and let the requester choose the ones for which they want records of contacts. We hope that a narrowed FOIA request for NIH records will allow us to complete processing the NIH records within the requested eight months.

I declare under penalty of perjury that the foregoing to true and correct. Executed on this 17th day of November, 2006.

_____
Robert Eckert