**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON | : : : |
| Plaintiff, | : : |
| v. | :  Civil Action No. 1:05CV01127(CKK) |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES | : : : : |
| Defendant. | : : |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR A STAY OF PROCEEDINGS**

**STATEMENT**

The Freedom of Information Act ("FOIA") mandates that agencies respond to FOIA requests within 20 working days. Through amendments to that Act, Congress created a safety valve for agencies facing truly exceptional circumstances when, despite their exercise of due diligence, they are unable to respond to requests within the statutory time-frame. Defendant U.S. Department of Health and Human Services ("HHS") seeks to invoke these provisions to delay these proceedings for an additional four years on top of the almost two-year delay that has already occurred since plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") first filed its FOIA request. Granting HHS's request for a stay of this length would be a gross miscarriage of justice.

Significantly, HHS's request is not based on any showing of exceptional circumstances but, instead, on a predictable agency workload and a record that is far from the due diligence the statute requires. As HHS's own statistics show, HHS's backlog is increasing, not decreasing,

despite the fact that HHS no longer has responsibility for a significant portion of FOIA requests. Just as troubling, HHS apparently redirected its current FOIA staff to less pressing matters than complying with FOIA's statutory mandates, such as redesigning the agency's FOIA web site.

In the face of a woefully inadequate record, HHS attempts to shift attention and blame to CREW, arguing that a stay is justified because CREW filed an over-broad FOIA request and has refused to narrow the scope of its request or to agree to an alternate time-table for production. This is incorrect. Despite repeated requests, HHS, through its counsel, has refused to explain to CREW how its request is over-broad or to give CREW a precise count of how many responsive documents the agency has. HHS has also refused to identify the nature of the thousands of pages that HHS has identified as potentially responsive, the categories of proprietary information contained in those documents, and whether HHS has already responded to other FOIA requests for similar information. Moreover, at no point since CREW filed its FOIA request has HHS contacted CREW directly to discuss any aspect of its request. Further, CREW can hardly be faulted for not agreeing to HHS's alternative time-frame of an additional eight months beyond the almost two years the agency has already consumed, when HHS has refused to provide CREW the information that would help CREW assess the legitimacy of such an extension and after CREW has waited nearly two years for a response of any kind.

## FACTUAL AND PROCEDURAL BACKGROUND

By letter dated January 11, 2005, Plaintiff requested under the FOIA that HHS produce records of any contacts between the agency and any external public affairs firms, including but not limited to Ketchum and Fleishman Hillard. *See* Exhibit F to Plaintiff's Amended Complaint. Plaintiff also requested records of any contracts that HHS may have entered into with any public

affairs firms, as well as records of any contacts between any HHS employee and the employees of any public affairs firm with which HHS had a contractual relationship. Id. In addition, CREW requested a waiver of fees associated with the processing of its request, and explained how it met the statutory and regulatory requirements for a fee waiver. Id.

Preceding CREW's FOIA request were widespread reports in the media that HHS and other agencies had violated the prohibition on publicity and propaganda by hiring public relations firms to produce covert propaganda. For example, in May 2004, the Government Accountability Office ("GAO") found that video news releases created by Ketchum Communications in support of the newly enacted Medicare law and distributed by Defendant HHS constituted illegal covert propaganda, because the releases failed to reveal the source of the information. U.S. Government Accountability Office, Department of Health and Human Services, Centers for Medicare and Medicaid Services - Video News Releases, GAO/B-302710 (May 19, 2004) ("GAO Report"). In addition, syndicated columnist Maggie Gallagher, who frequently wrote pieces supporting the Bush administration's $300 million initiative encouraging marriage, received a $21,500 contract from HHS. Howard Kurtz, Writer Backing Bush Plan Had Gotten Federal Contract, *The Washington Post*, January 26, 2005 (attached as Exhibit C to Amended Complaint). Once that contract became public, HHS disclosed that it had also paid conservative columnist Mike McManus $10,000 to assist in promoting Bush administration policy and the President's marriage initiatives. Siobhan McDonough, Another Columnist Was Paid to Help Bush Administration Agency, *San Francisco Chronicle*, January 29, 2005 (attached as Exhibit D to Amended Complaint).

In light of the questions raised about the use of taxpayer dollars to fund public relations

campaigns, the minority staff of the House Committee on Government Reform prepared a report on the Bush administration's public relations spending. According to that report, in the four-year period from 2001 through 2004, the federal government spent over $250 million on 286 contracts with major public relations agencies. U.S. House of Representatives Committee on Government Reform – Minority Staff, Special Investigations Division, <u>Federal Public Relations Spending</u>, p. 4 (Jan. 2005) (attached as Exhibit E to Amended Complaint). The majority of this spending went to four large firms: Ketchum Communications received $97 million in contracts, The Matthews Media Group received $51.6 million in contracts, Fleishman Hillard received $41.1 million in contracts, and Porter Novelli received $33 million in contracts. <u>Id</u>. at 6.

Nearly five months after filing its FOIA request, CREW had received neither a response to its request nor a time-frame within which HHS would respond. Accordingly, CREW filed its complaint on June 7, 2005.

Thereafter, by letter dated June 30, 2005, HHS advised CREW that the agency was denying CREW's request for a fee waiver. *See* Exhibit G to Amended Complaint. CREW filed an administrative appeal of HHS's initial determination on July 6, 2005. *See* Exhibit H to Amended Complaint. By letter dated July 14, 2005, HHS advised CREW that HHS had made a final decision to uphold the agency's denial of CREW's request for a fee waiver. Exhibit I to Amended Complaint.

On July 20, 2005, CREW filed an amended complaint to add facts and counts dealing with HHS's denial of CREW's request for a fee waiver. Thereafter, the parties filed cross-motions for partial summary judgment on the fee waiver issue. On September 8, 2006, the Court issued a memorandum opinion granting plaintiff's motion, denying defendant's motion, ordering

HHS to grant CREW's fee waiver by October 6, 2006, and ordering the parties to file a joint status report by October 13, 2006.

Despite CREW's repeated requests for information necessary to evaluate the appropriateness of HHS's proposed production schedule, the agency declined to provide the requested information. *See* Joint Status Report at 2-4. As a result, the parties could not agree on a joint production schedule and on October 13, 2006, the parties filed a status report that set out two separate proposals– plaintiff proposed December 31, 2006, as a date for final production and HHS gave no time table for completion and, instead, outlined the current status of CREW's request.

On October 18, 2006, the Court issued an order requiring HHS to make its first production by November 17, 2006, and its final production by January 26, 2007, unless the agency sought a stay by November 17, 2006. On November 16, 2006, HHS made its first production to CREW of approximately 2,700 pages, with certain portions withheld under Exemptions 4 and 6 of the FOIA.

On November 17, 2006, HHS filed a motion for stay of proceedings. This motion sought an extension until August 10, 2007, to produce documents with the exception of NIH documents, for which HHS sought an extension until August 10, 2010. Yesterday, on the eve of plaintiff's due date for filing a response, HHS filed an amended motion accompanied by the Supplemental Declaration of Robert Eckert ("Supp. Eckert Decl."). HHS now claims that the amount of responsive documents is not 30,000, as set forth in its original motion, but is in the range of 11,000 to 12,000 pages exclusive of NIH documents. Accordingly, HHS now seeks an extension until April 20, 2007, and until January 26, 2010, to produce all NIH documents. In addition,

5

NIH asks the Court to order CREW to narrow its request to exclude "all contact information." Defendant's [Amended] Motion for a Stay of Proceedings, p. 2 ("D's Amended Motion").

## ARGUMENT

### I.  HHS's Unreasonable Delay In Processing CREW's FOIA Request Should Not Be Rewarded By Granting HHS Its Requested Stay.

#### A.  HHS Has Not Exercised Due Diligence.

Under the FOIA, an agency may be entitled to a stay of any court proceeding to allow the agency to complete its processing of the FOIA request at issue, but only if the agency can demonstrate that "exceptional circumstances exist and that the agency is exercising due diligence in responding to the request."  5 U.S.C. §552(a)(6)(C)(i).  Through this statutory provision, added by the Electronic Freedom of Information Act Amendments of 1996, Congress excluded from the definition of "exceptional circumstances" "delay that results from a predictable agency workload of requests . . . unless the agency demonstrates reasonable progress in reducing its backlog of pending requests."  Pub. L. No. 104-231, §7(c), 110 Stat. 3048, codified at 5 U.S.C. §552(a)(6)(C)(ii).  Moreover, while the amendments allow an agency to establish multitask processing "based on the amount of work or time (or both) involved in processing requests," id. at §552(a)(6)(D)(i), the agency must still establish it is exercising "due diligence" within each track by processing on a first-in, first-out basis to qualify for a stay.  Id. at §552(a)(6)(D)(iii).

Here HHS pays lip service to meeting the "due diligence" standard, but the actual facts tell a different story.  First, while HHS has characterized CREW's request as "complex"[1] (albeit with no explanation for what constitutes a "complex" request), it does not appear to have

---

[1] *See, e.g.*, Defendant's Memorandum in Support of Stay Proceedings ("D's Mem.") at 6.

multitask processing that places complex requests in a separate queue from simpler requests for processing. Instead, as Robert Eckert, the Director of HHS's Freedom of Information/Privacy Acts Division, describes, there is one track containing both simple and complex requests, and within that track simpler requests are pulled out of order and processed ahead of complex requests. Declaration of Robert Eckert ("Eckert Decl."), ¶10 (attached to D's Mem.). This system does not meet the due diligence requirements mandated by 5 U.S.C. §552(a)(6)(D)(iii); by placing allegedly simpler requests ahead of CREW's request for processing (D's Mem. at 7), HHS failed to process on a first-in, first-out basis. On that basis alone HHS is not entitled to a stay of proceedings.

Second, HHS's claims of due diligence are severely undermined by its choice to divert important FOIA resources away from processing FOIA requests, as the statute commands, to more discretionary tasks. For example, the FOIA specialist at HHS responsible for handling CREW's request has also been charged with updating HHS's FOIA web page. Eckert Decl., ¶41. HHS's FOIA staff is also diverted from processing to handle other administrative demands. Id. at ¶4. And "a significant part" of Mr. Eckert's time for an entire six months in 2006 was devoted to coordination and drafting a FOIA Improvement Plan. Id. at ¶21.

Third, there have been significant and unaccountable delays in HHS's processing to date that reflect a lack of due diligence. CREW filed its request on January 11, 2005, and this lawsuit on June 7, five months later, after hearing nothing from the agency.[2] Weeks later, by letter dated

---

[2] HHS claims that at some unidentified point in time it "acknowledged receipt of the request to the requester." Eckert Decl., ¶29. HHS has not included such correspondence and CREW has no such acknowledgment in its files, with the exception of notification from the Public Health Service.

June 20, 2005, HHS denied CREW's request for a fee waiver.  In that letter HHS claimed to be "in the process of estimating FOIA processing costs, as well as the time needed to complete processing your request."  Letter from Rosario Cirrincionne, Director, FOI/Privacy Acts Division, to Melanie Sloan, June 30, 2006 (Attachment 2 to Eckert Decl.).  Mr. Eckert's declaration makes a similar claim;[3] indeed, he claims that CREW's request was sent to 11 components within HHS "immediately upon receipt."  Eckert Decl., ¶29.  Such estimate, however, was never forthcoming until the joint report filed by the parties on October 13, 2006, and even then it was incomplete.

In other words, HHS has consumed ten months just in identifying *"potentially responsive"* documents, id. at ¶38 (emphasis added), and still expects (for unexplained reasons) that "several thousand more pages will be deemed responsive."  Id.  This is hardly the record of an agency exercising due diligence.

Fourth, the Eckert declaration is at such a level of generality that it cannot reasonably justify HHS's requested stay.  It does not explain, for example, why after ten months, and in response to a very specific request for very specific documents, the agency could state only that it has 30,000 pages that might be responsive.  The agency has now adjusted that number downward to 11,000 to 12,000 pages, based on a decision that many of the documents identified as potentially responsive are, in fact, not within the scope of CREW's request.  Supp. Eckert Decl., ¶5.  The lack of detail for either number, however, raises a very legitimate concern that the agency is wildly inflating the number of responsive documents to justify the extraordinary amount of time it is seeking and the extraordinary amount of time that has already elapsed with

---

[3] *See* Eckert Decl. at ¶¶ 29-31.

8

little action on HHS's part.

This concern is magnified with respect to NIH which, according to HHS, has "approximately 500,000 pages of records" responsive to CREW's request. Eckert Decl. at ¶39. Notably HHS's proposal in the Joint Status Report is completely silent about this body of documents, which until now HHS has never identified to CREW or the Court. The agency's declaration is completely lacking in any specifics that would enable the Court to ascertain whether this is a good-faith estimate and why it would take NIH up to five years to produce the documents.

In addition, the Eckert declaration does not identify which components have responded, which have yet to respond and why, with the exception of the Centers for Medicare and Medicaid Services which is identified for the first time in the Supplemental Eckert Declaration as having responsive documents. The Eckert declaration does not adequately explain why, given that each organizational component to which CREW's request was sent "has its own autonomous FOIA Officer who handles requests for its records,"[4] and given that each component will do "an initial review," id. at ¶38, Mr. Eckert's Office "must do a line-by-line and word-by-word review of all responsive documents, handle any pre-disclosure notifications . . . and propose any suggested redactions," id. at ¶40, a process that clearly will consume an inordinate amount of time.

Fifth, HHS has not explained why, in the face of the 2004 GAO Report and other FOIA requests on this subject, HHS is not better prepared to respond to CREW's request. As Mr. Eckert has explained, "[e]xceptions to the 'first-in, first out' policy are made if the request is for

---

[4] Eckert Decl., ¶3.

materials already reviewed and released for another, similar FOIA request and, therefore, readily available." Eckert Decl. at ¶11.  The GAO Report was issued in 2004, addressed the precise issue that is the subject of CREW's FOIA request, and undoubtedly relied in part on documents provided to it by HHS.  Moreover, it is CREW's understanding – an understanding that HHS's counsel has suggested is correct, but has refused to date to confirm – that HHS has received other FOIA requests that are similar to CREW's request.  Yet HHS has not explained why these readily available documents were not produced immediately to CREW and why, under HHS's stated exception to its first-in, first-out policy, CREW was not placed at the head of the queue, at least with respect to the readily available documents.   These omissions are fatal to HHS's claim that it is exercising due diligence.

### B.  HHS Is Not Facing Exceptional Circumstances, But Rather A Predictable Agency Workload.

Although HHS claims that it is facing "exceptional circumstances" that warrant a four-year stay, the record does not support this claim.  HHS's workload is entirely predictable and, just as problematic for the agency's stay request, HHS's backlog is increasing, not decreasing, even in the face of a reduced workload.

First, HHS claims that over the past several years it has faced a "deluge[]" of requests. D's Mem. at 10.  Yet in FY 2006, the most relevant year for purposes of CREW's FOIA request, HHS's workload actually *decreased* because Mr. Eckert's office no longer has responsibility for processing FOIA requests for the Administration for Children and Families.  Eckert Decl., ¶18. As a result, in FY 2006 his office received 843 requests, compared to the 1,163 requests it received in FY 2005.  Id. at ¶¶17-18.

HHS stresses that its purported "exceptional" workload is largely the result of complex

requests it has received.  *See, e.g.*, D's Mem. at 10, 13-14.  HHS has not explained, however, what makes such requests "complex," beyond the fact that they require searches of multiple components of HHS.  This can hardly be called "exceptional circumstances" given that it is a function of the fact that HHS is composed of multiple components -- like virtually every other agency -- and that Mr. Eckert's office has elected not to establish two separate queues for simple and complex requests.  And what HHS has not demonstrated is that the nature of FOIA requests it has received has changed over time, a necessary factual predicate to demonstrating exceptional circumstances, rather than a predictable workload.

Similarly, none of the other excuses HHS offers qualifies as "exceptional circumstances," and all are part of the agency's predictable workload.  That the Freedom of Information/Privacy Acts Division has other responsibilities, including Privacy Act requests and administration (D's Mem. at 11), is a predictable constant.  That Division's assistance with litigation is also predictable; although Mr. Eckert describes the litigation burden for FY 2006 as "heavy" (Eckert Decl. at ¶22), he does not explain whether and how it differs from other years, necessary facts to establish that it contributes to an exceptional, rather than predictable workload.  At most HHS has demonstrated an "ordinary and expected" delay which is insufficient to justify the requested stay.  Fiduccia v. U.S. Dep't of Justice, 185 F.3d 1035, 1041 (9th Cir. 1999).

HHS also relies on the fact that for almost one year, from July 2005 through April 2006, it had a staff vacancy.  Eckert Decl. at ¶19.  But while Mr. Eckert claims generally that he has "sought staff increases in my office and to fill vacant positions," he does not provide the necessary detail as to what he requested and the response to any such requests.  In the absence of specific budgetary requests and denials the agency cannot rely on its bald claim that it has made

some effort to increase its staff as justification for a four-year stay.  Moreover, in 2006 Mr. Eckert's office *added* an additional FOIA analyst (Eckert Decl. at ¶21), further undermining the agency's claim of exceptional circumstances.

HHS also places great stock on the fact that in 2003 the Director was absent due to the illness and death of his wife.  D's Mem. at 10.  CREW's FOIA request, however, was filed in 2005, and the agency has admitted that until the Court's ruling on the fee waiver issue the agency did very little to process that request.  Accordingly, a vacancy three years ago cannot justify the agency's inability to process CREW's now in a timely and efficient manner.

As these facts demonstrate, during the last year Mr. Eckert's office has increased its FOIA staff and decreased its FOIA workload.  At the same time, there has been no systematic effort to redistribute personnel to deal with any backlog or to prioritize in a way that would effectively reduce the backlog.  To the contrary, as discussed above, the agency has elected to divert FOIA resources to address less critical issues, such as the redesign of the agency's web site.

A critical factor in evaluating the appropriateness of a requested stay is whether the agency is making "reasonable progress in reducing its backlog of pending requests."  5 U.S.C. §552(a)(6)(C)(ii).  *See also* The Wilderness Society v. U.S. Dep't of Interior, 2005 U.S. Dist. LEXIS 20042 (D.D.C. 20205).  Here, HHS's backlog is increasing with the exception of 2006, when HHS no longer had responsibility for a significant area of FOIA requests.  According to HHS's own statistics, it ended FY 2003 with a backlog of 362 requests.  Eckert Decl., ¶15.  At the close of FY 2004 HHS had a backlog of 523 requests.  Id. at ¶16.  This upward trend continued in FY 2005, when it had a backlog of 751 requests.  Id. at ¶17.  And in FY 2006, its

"very preliminary statistics" show that while the backlog decreased, it "is explained by [Mr. Eckert] my office no longer being responsible for directly processing FOIA requests for the Administration for Children and Families." Id. at ¶18. Moreover, even with a declining backlog and responsibility for fewer requests, the agency actually processed fewer requests in FY 2006 (565) when compared to FY 2005 (935). Id. at ¶¶17, 18.

As these statistics reveal, HHS has not made reasonable progress in reducing its backlog; to the contrary, its backlog has increased. Under these circumstances HHS cannot demonstrate the exceptional circumstances that would justify its requested stay. *Contrast* Electronic Privacy Information Center v. U.S. Dep't of Justice, 2005 U.S. Dist. LEXIS 18876 at *4 (D.D.C. 2005) (stay justified where agency could show "reasonable progress in reducing its once-substantial backlog").

HHS also publishes annual statistics on the median processing time of various components of HHS. *See, e.g.*, HHS Fiscal Year 2005 Freedom of Information Annual Report, available at www.hhs.gov/foia/05anlrpt.html. Unfortunately, none of the reports available on-line from FY 2001 through FY 2005 contains a median processing time for the Office of the Assistant Secretary for Public Affairs, the office Mr. Eckert heads and that has responsibility here for CREW's request. It is noteworthy, however, that for FY 2005, the longest reported median processing time (excluding the FDA which has separately informed CREW that it has no responsive documents) is 173 days for NIH, followed by 86 days for the Centers for Medicare and Medicaid Services ("CMS"). Here, by contrast, HHS is seeking a period of over two years to complete processing of CREW's request (from January 11, 2005, the date CREW filed its request, to April 20, 2007), with the exception of NIH for which it seeks a total of five years to

complete processing (from January 11, 2005, through January 26, 2010). The requested period far exceeds the reported median processing times for any other HHS component.

In the face of this record HHS clings to the fact that the Director of HHS's central FOIA office has spent "considerable time during 2006" implementing a "FOIA Improvement Plan." D's Mem. at 14. If such a plan has, in fact, been implemented CREW has yet to see the results of what purports to be a "more citizen-centered" approach. Eckert Decl. at ¶21. At no time since CREW filed its request did HHS reach out to CREW. CREW filed its complaint in this action only after CREW was told, in response to a telephone call CREW placed to the agency, that HHS could give CREW "no estimate of when HHS would complete its processing of the FOIA request." Amended Complaint, ¶26.

The supplemental filings that HHS just filed are yet another example of how, despite its rhetoric to the contrary, HHS is decidedly not taking a more citizen-oriented approach. HHS has now revised downward its estimate of responsive documents based on its unilateral decision, and without any prior communication to CREW, that many of the documents initially identified as responsive are, in fact, outside the scope of CREW's FOIA. Supp. Eckert Decl. at ¶5. CREW does not challenge HHS's decision to exclude "actual contract deliverables and invoices," but CREW very much challenges the process HHS used to make this decision, which involved no communication -- before or after -- with CREW about the scope of its request. Had HHS at any time since CREW filed its request simply picked up the phone and called CREW it is likely that the parties could have narrowed the scope in a way that would have limited, or eliminated altogether, the need for the Court's involvement.

CREW has fared no better in discussions with HHS's counsel that occurred only after the

Court ordered the parties to file a joint status report. HHS was unwilling to satisfy CREW's repeated requests for information that would help CREW evaluate the appropriateness of the production schedule HHS was proposing. *See* Joint Status Report, pp. 2-3. This is hardly a more "citizen-centered" approach, and belies HHS's claim that it is trying to "deal with all of its responsibilities . . . by 'increasing contacts between FOIA specialists and the requesters.'" D's Mem. at 11-12, *quoting* Eckert Decl. at ¶24.

Finally, HHS argues that a stay is justified because CREW has refused to limit the scope of its request and has rejected HHS's proposed alternative time frame for processing. D's Mem. at 12-13. This is a gross mischaracterization of what has transpired and does not take into account the inherent unreasonableness of HHS's position.

Here, as in most FOIA cases, the agency possesses all the information and the requester is in the dark as to the universe of responsive documents. Thus, the requester depends on the agency to provide sufficient information to meaningfully evaluate any alternative proposal and to determine how to narrow the scope of its request. HHS, however, has refused to provide such information.

For example, HHS faults CREW for failing to identify a specific list of public affairs firms for HHS to search. D's Mem. at 12. HHS has it backwards -- it is the agency, not CREW, that was in the best position to provide a list of firms and contracts from which CREW could choose. CREW, a public interest ethics watchdog group, filed its request on the heels of revelations that HHS was using taxpayer dollars to fund public relations campaigns and covert propaganda that furthered the Administration's political goals. CREW could not identify from the public record the entire universe of public affairs firms with which HHS had contracted for

these purposes -- this is information uniquely in HHS's possession which is why CREW requested it in the first place through its FOIA request of HHS.  Accordingly, CREW can hardly be faulted for being unwilling to narrow the list of firms based on nothing more than guesswork.

HHS also asked CREW to exclude from its request any Exemption 4 material.  CREW indicated a willingness to do so provided that HHS identify for CREW the categories of proprietary information contained in the documents.  Despite the fact that this is an easily accomplished task -- HHS needed to do no more than identify such information as "pricing," etc. -- HHS refused and now takes the absurd position that "the category is obviously outside parties' proprietary information."  D's Mem. at 12.[5]  In short, the blame does not lie with CREW for failing to accede to patently unreasonable requests.

According to HHS, CREW's "unwillingness to cooperate with the agency" is also reflected in CREW's refusal to agree to HHS's alternative schedules.  Id. at 13.  First, as HHS essentially concedes, it did not propose two different schedules.  More to the point, HHS wanted CREW to agree to an open-ended time frame that might take an additional eight months beyond the two years HHS will have consumed, but with HHS's admission that "it is difficult to estimate at this time [how long the entire process will take] because the processing of the request is at its early stages."  Joint Status Report at 5.  Indeed, CREW's caution was justified -- HHS now

---

[5] In its amended motion HHS also asks, for the first time, that the Court order CREW to "narrow its request to exclude all contact information" in the NIH documents.  D's Amended Motion, p. 2.  CREW has no idea what HHS means by "contact information," as the term is neither explained here nor in HHS's original motion.  Moreover, HHS does not cite to any legal authority -- and CREW knows of none -- for its extraordinary request that the Court impose limits on the scope of CREW's FOIA request simply because the agency does not want to do the work.  And HHS does not explain what, if any, time reductions would be achieved by this limitation.

claims, for the first time, that it also needs an additional five years to process documents from NIH, and seeks a stay until August 2007 for the rest of the documents, not June 2007, as it first proposed (*see* id. at 3).

Simply stated, the agency made an unreasonable request that CREW blindly modify the scope of its FOIA request and agree to an open-ended time frame for processing that, at best, would give CREW the documents to which it is statutorily entitled approximately two and one-half years after CREW first made the request. Moreover, the agency refused then, and continues to refuse to provide anything more than vague generalities about why it needs more time and why it cannot process the documents at a faster pace. Accordingly, CREW's refusal to comply with the agency's request is far from unreasonable and cannot properly justify the requested stay.

### C. HHS Has Not Justified The Time Extensions It Seeks.

Not only has HHS failed to satisfy the statutory requirements for a stay to complete its processing of CREW's request, but it has not justified the significant time extensions it is seeking. HHS initially attempted to justify its request for a stay until August 10, 2007, to process the request (excluding NIH documents) by its claim that "CREW's request is very complicated and involves the coordination of many components." D's Mem. at 17. There is nothing complicated about CREW's request -- CREW seeks records of contacts between HHS and public relations firms based on the numerous articles documenting HHS's use of such firms to produce propaganda. This request is identical to FOIA requests CREW sent to many other agencies, the vast majority of which have been responded to in full. There is certainly nothing unique about HHS that explains why it could not respond in like fashion and, instead, needs two and one-half years. That CREW is seeking documents that are found at more than one

17

component of HHS surely is not a sufficient basis to characterize the request as "particularly difficult." Id. Indeed, the work of Mr. Eckert's office is to coordinate the release of records from multiple components of HHS. *See* Eckert Decl. at ¶3.

HHS's supplemental filing fares no better. While the agency has revised its time-table and now seeks an extension until April 20, 2007 (rather than August 10, 2007), it has still not provided any detail to explain why it needs that additional amount of time.

Just as deficient is HHS's request for an extension until January 26, *2010*, for NIH to complete its processing of the request.[6] As justification HHS offers nothing more than "[t]he NIH documents are more complicated" and "*may* involve 500,00 pages of documents." D's Mem. at 17 (emphasis added). HHS is silent on how this number is derived.

In fact, absent from HHS's request are any specifics that would explain why the agency needs the lengthy time extensions it is seeking. Bald claims that the requests are "complicated," that they could require pre-disclosure notification, and that they could result in thousands of pages of responsive documents are no substitute for the fact-specific showing the agency must make to justify the multi-year extension it is seeking. *See* Center for Public Integrity v. U.S. Dep't of State, 2006 U.S. Dist. LEXIS 22281 (D.D.C. 2006);

## **CONCLUSION**

The two-year anniversary of CREW's FOIA request is fast approaching and, to date, the agency has produced only a fraction of the responsive documents it claims to have. In the meantime HHS has not acted with due diligence and it is facing a predictable, not extraordinary,

---

[6] HHS initially sought an extension for NIH documents until August 10, 2010. It now claims that this was a "clerical error" and that the correct date should be January 26, 2010. D's Amended Motion at 2 n.2. Its latest request suffers from the same defects as the initial request.

workload. Under these circumstances, its request for a multi-year stay must be denied.

.

                Respectfully submitted,

                ____/s/_____
                Anne L. Weismann
                (D.C. Bar No. 298190)
                Melanie Sloan
                (D.C. Bar No. 434584)
                Citizens for Responsibility and
                 Ethics in Washington
                1400 Eye Street, N.W., Suite 450
                Washington, D.C.  20005
                Phone: (202) 408-5565
                Fax: (202) 588-5020

                Attorneys for Plaintiff

Dated:  December 1, 2006