**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) |
| Plaintiff, | )    CV-05-1127 (CKK) ) |
| vs. | ) ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES | ) ) ) |
| Defendant. | ) ) |

_____)

**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION**
**TO ITS MOTION FOR A STAY OF PROCEEDINGS**

Before this Court's involvement, defendant Department of Health and Human Services ("HHS") proposed two different time frames, both involving a rolling production, for processing the documents responsive to CREW's exceptionally broad Freedom of Information Act ("FOIA") request. CREW rejected both proposals. Prior to the filing of the Joint Status Report in this case, HHS also proposed two different ways for CREW to limit the scope of its broad request so as to facilitate a quicker production. CREW rejected both of those offers. In its memorandum in support of a stay of proceedings and in the supporting declaration, HHS proposed another way to limit the vast amount of documents from the National Institute of Health ("NIH"). In its Opposition brief, CREW did not address this proposal.

The agency is working with great diligence to process plaintiff's FOIA request, even revising its earlier estimates of how much time is required to complete the production of non-NIH documents. Exceptional circumstances plainly exist so as to justify a stay. As explained above, CREW has unreasonably refused to modify the scope of its request or to agree to two

different alternative time frames for a rolling production.  CREW, not the agency, is aware of

what information it is trying to glean from the documents so it is incumbent upon CREW to limit

the scope of its broad request.  In addition, the agency has made great efforts to reduce its

backlog.  Although, CREW views those efforts as being diversions from the processing of FOIA

requests, the point of those efforts is in fact to process the requests in a more timely manner.  The

agency has shown that it has also lost valuable resources due to complicated requests and

litigation activity.  Finally, the agency has shown that it is reducing its backlog when it has

arisen from a predictable workload.

> Instead of finding ways to work with the agency, CREW acts as if it is the only entity

submitting FOIA requests to HHS.  CREW ignores the D.C. Circuit's strong admonition that

first in court does not mean first in line.  See Open Am. v. Watergate Special Prosecution Force,

547 F.2d 605, 615 (D.C. Cir. 1976)("[i]f everyone could go to court when his request had not

been processed within thirty days, and by filing a court action automatically go to the head of the

line at the agency, we would soon have a listing based on priority in filing lawsuits, i.e., first in

court, first out of the agency.").  "The plaintiff bears the burden of showing a genuine need and

reason for urgency in gaining access to Government records ahead of prior applicants for

information." Edmond v. United States Attorney, 959 F. Supp. 1, 3 (D.D.C. 1997) (internal

quotation marks omitted).  CREW has never asked for expedited review of its request.  See

Eckert Decl. at ¶ 26.  Instead, the plaintiff tries to focus on the subject matter of its request but

that is irrelevant to a court's determination of whether an agency is entitled to an Open America

Stay.  Cf. Brandon v. Eckard, 569 F.2d 683, 687-688 (D.C. Cir. 1977) ("FOIA does not

discriminate among persons seeking access to materials on grounds of their particular interests in

the requested information"). Because the agency has amply demonstrated that exceptional circumstances exist to justify a stay, defendant's motion should be granted.

## ARGUMENT

### I.    HHS has Demonstrated that it has Acted with Due Diligence in Processing CREW's Request

Congress provided that "[i]f the Government can show that exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records." 5 U.S.C. § 552(a)(6)(C)(i) (emphasis added). In addition to what is already contained in defendant's Memorandum in Support of its Motion for a Stay of Proceedings (Defs. Mem.) and the supporting declaration ("Eckert Decl."), HHS has put forth additional evidence of its due diligence in the supplemental declaration it has filed with this Court. See Defs Mem at 6-9 (Docket #25); Eckert Decl. (Docket #25); Eckert Supplemental Declaration ("Eckert Supp. Decl.") (Docket # 26). HHS filed this supplemental declaration on November 30, 2006, the day immediately following the date the HHS FOIA Office "became aware of a change in the estimated responsive pages from the Centers for Medicare and Medicaid Services (CMS)." See Eckert Supp. Decl. at ¶ 2. Upon learning this information, HHS revised its estimate of when it could complete processing of all non-NIH documents by reducing it by almost three months. See Eckert Supp. Decl. at ¶ 7. The agency is now seeking a modest stay of fewer than three months for all non-NIH documents from January 26, 2007, to April 20, 2007. Id.

Instead of welcoming this reduction in time, CREW makes the unfounded assertion that this revised estimate "raises a very legitimate concern that the agency is wildly inflating the

number of responsive documents to justify the extraordinary amount of time it is seeking and the extraordinary amount of time that already elapsed with little action on HHS's part."  See Pl. Opp. at 8-9.  CREW has no basis for such an assertion.  Instead, the supplemental declaration explains in detail how HHS was able to shift downward its estimate of potential pages.  CMS had originally estimated that it had "27,000 pages" of responsive documents but now estimates that the number is more likely between "6,000 and 7,000 pages."  See Eckert Supp. Decl. at ¶ 4. The difference is because the different offices within CMS "had forwarded approximately 27,000 pages of documents relating to public affairs entities [to the CMS FOIA office]." However, "[w]hile reviewing those pages, CMS [became] aware that those pages include documents that the FOIA office did not consider responsive."  Id. at ¶ 5.  They included "contract deliverables and contractor invoices, which fall outside the scope of CREW's request" because "many are publicly available" and others are either duplicative of what are in the contracts or solely contain materials that are protected by Exemption 4 of the FOIA.  See id. Besides the fact that CREW has been unwilling to narrow the scope in other ways, CREW misses the point that this was not an attempt by HHS to unilaterally narrow the scope of CREW's request.  See Pl. Opp. at 14 (CREW asserts that had HHS picked up the phone, CREW would "have narrowed the scope" in such a way).  Instead, this was an interpretation by the CMS FOIA office that the documents that the CMS personnel sent to the FOIA office were outside the scope of CREW's request, a type of a decision that an agency's FOIA office routinely makes in processing any request.

Throughout its Opposition brief, CREW repeatedly and misleadingly states that there has been an "almost two-year delay" in processing the request.  See, e.g., Pl. Opp. at 1.  The "two

years" cited by CREW includes the fifteen months that the agency temporarily suspended

processing of the request, pursuant to its regulations, as the parties briefed and this Court decided

the fee waiver issue. See 45 C.F.R. § 5.44(b) (the administrative time limits in processing a

request "will begin only after [HHS] come[s] to an agreement with [the requester] over payment

of fees, or decide[s] that fee waiver or reduction is appropriate."). Furthermore, HHS informed

CREW that it was suspending processing when the issue of a fee waiver was still outstanding.

See Eckert Decl., Attachment 2 (June 30, 2005, fee waiver denial letter informed CREW that

"[s]ince [CREW has] not agreed to pay any processing costs, [its] request has been temporarily

suspended, as the search and duplication charges may be substantial."). Elsewhere in its brief,

CREW does not explain how it comes up with "ten months" as the time it purports that HHS has

taken to identify potentially responsive documents. See Pl. Opp. at 8. No explanation is given

because this period of time has no basis in fact.[1]

     In another effort to undermine the agency's due diligence in processing its request,

CREW inaccurately claims that, with the exception of the CMS, the "Eckert Declaration does

not identify which components have responded." See id. at 9. CREW ignores paragraph 43 of

Eckert's original declaration. See Eckert Decl. at ¶ 43 ("[a]s of the date of this declaration, we

have released approximately 2,708 pages including about 1,324 from [the Centers for Disease

---

[1]If one considers that HHS received the request in mid-January and suspended its search
June 30, 2005, that accounts for only five and a half months. If CREW also includes the time
between the granting of the fee waiver on October 2, 2006 (or Eckert's memorandum to the HHS
components on September 29, 2006, instructing them to do a thorough search), and the time
of the first production on November 16, 2006, this accounts for another month a half, totaling seven
months. See, infra, at 16. During this time, HHS has done more than just identify potentially
responsive documents. It produced a set of documents at the end of this period, which requires
identifying the documents that are actually responsive, reviewing them for exemptions, taking
care of any necessary pre-disclosure notifications, and sending them out to the requester.

Control]; about 1,160 from CMS, about 136 from [the Health Resources and Services Administration], and about 88 from [the Agency for Healthcare Research and Quality ("AHRQ")]. The released AHRQ are all the responsive records from AHRQ. [The Indian Health Service] found no responsive records."). CREW is also dismissive of the necessity of the central FOIA office conducting a review of the records after the different components do their own review. <u>See</u> Pl. Opp. at 9 (claiming that such a process "clearly will consume an inordinate amount of time"). However, the declaration clearly states that this is necessary to "ensure that the request is being interpreted consistently by the different components and that the statutory exemptions asserted are being consistently applied." <u>See</u> Eckert Decl. at ¶ 30. Furthermore, it is part of the agency's regulations that only "the HHS Freedom of Information Officer may determine whether to release or deny records" if, <u>inter alia</u>, the records include those from the Office of the Secretary or include "records of more than one of the major units." <u>See</u> 45 C.F.R. § 5.31(a)(1).

CREW is also incorrect to claim that the declaration submitted by HHS is "completely silent about [the] body of documents" NIH has identified as potentially responsive to CREW's request. Reading this sentence on its own, one would think that the declaration merely states that there are "approximately 500,000 pages of records" within NIH and no more. In fact, the declaration says much more. First, the declaration mentions that there are "70 contracts/task orders/purchase order that may be responsive to the FOIA request." <u>See</u> Eckert Decl. at ¶ 39. Second, the declaration mentions that the "estimated page count for these records is 1,300 pages." <u>Id</u>. Third, the declaration explains that the difference between the 1,300 pages and 500,000 pages is the "'contact' records that would be associated with these contracts." <u>Id</u>.

Fourth, HHS explains that it could facilitate a quicker production if it produced the contract "awards or Statements of Work first and let the requester choose the ones for which they want records of contacts."[2]  Id.  CREW does not acknowledge this proposal.  Instead, CREW makes the outlandish claim that the agency may not be acting in "good faith."  See Pl. Opp. at 9 ("[t]he agency's declaration is completely lacking in any specifics that would enable whether this is a good-faith estimate").  The agency has already demonstrated with its revision to its estimate for non-NIH documents that it is constantly re-evaluating what needs to be done to process CREW's request.  Furthermore, it is presumed that an agency is acting in good faith.  See Appleton v. Food and Drug Administration, 451 F.Supp.2d 129, 137 (D.D.C. 2006) ("an agency's affidavits are presumed to be in good faith" in FOIA case).

Even though the Eckert Declaration sufficiently states the basis for 500,000 pages of documents and good faith is presumed, the agency has added another declaration to justify how NIH estimated the 500,000 pages.  See Cornell Declaration ("Cornell Decl."), attached.  The Freedom of Information Officer for the NIH explains that this 500,000 page estimate includes an approximation of 108,000 pages of contact records for thirteen contracts from the National Cancer Institute, approximately 154,000 pages of contact records for four contracts from the

---

[2]CREW claims that it is unaware of what HHS meant in its motion for all contact information to be excluded in the NIH documents and that "HHS does not explain what, if any, time reductions would be achieved by this limitation."  See Pl. Opp. at 16 n. 5.  The point is that CREW's request is extremely broad and without CREW's willingness to accept alternative ways for NIH to process the request, NIH will need an additional three to five years.  CREW is well aware of what is meant by "contact information," considering that it is CREW that requested all contact information involving the agency and public affairs firms.  CREW also is well aware of what would be achieved by confining its search to just Statements of Work and contract awards. The agency made it clear that if "CREW elects to receive only the Statements of Work and the contract awards," then HHS "could produce the NIH documents in the same time-period, eight months."  See Defs Mem at 17; see also Eckert Decl. at ¶¶ 38, 39, and 45.

National Heart, Lung, and Blood Institute, approximately 37,000 pages of contact records for twelve contracts from the National Institute of Allergy and Infectious Diseases, approximately 179,000 pages of contact records for three contracts from the National Institute of Diabetes and Digestive and Kidney Diseases, and approximately 12,000 pages of contact records for 2 contracts from the National Institute of Mental Health.  See id. at ¶ 5.  As the NIH FOIA officer explains, "NIH provides a great deal of health education to the public for which a public affairs firm may be contracted."  Id. at ¶ 6.  In addition to explaining the sources of the hundreds of thousands of pages, the NIH FOIA officer describes the diligence she used in determining the potentially responsive records among the "27 NIH Institutes and Centers."  Id. at ¶ 4.

In addition to belittling the efforts of HHS in processing CREW's request, CREW misstates the proper standard for determining if an agency has exercised due diligence in responding to a requester's request.  CREW cites to 5 U.S.C. § 552(a)(6)(D)(iii) for the proposition that "the agency must still establish it is exercising 'due diligence' within each track [if an agency uses a multitrack system] by processing on a first-in, first-out basis to qualify for a stay" and that HHS's "system does not meet the due diligence requirements mandated by 5 U.S.C. § 552(a)(6)(D)(iii) by placing alleged simpler requests ahead of CREW's request for processing."  See Pl. Opp. at 6-7.  However, the provision, to which CREW cites, 5 U.S.C. § 552(a)(6)(D)(iii), specifically states that an agency's use of a multitrack system "shall not be considered to affect the requirement [] to exercise due diligence."  That statutory provision does not reference a first-in, first-out requirement.  Nevertheless, HHS does process its FOIA requests on "a 'first in, first out' basis, in the order in which [the HHS central FOIA office] receive documents responsive to the request."  Eckert Decl. at ¶ 10.  This is consistent with the

instruction that an agency is to exercise "due diligence in processing requests on a first-in, first-out basis." <u>Appleton</u>, 254 F. Supp. 2d at 8 (citing <u>Open Am.</u>, 547 F.2d at 616); <u>Ohaegbu v. FBI</u>, 936 F. Supp. 7, 8 (D.D.C. 1996).  HHS just facilitates its due diligence by processing "the simpler requests first so as not to delay the processing of all FOIA requests until [it] receive[s] records for the more complex requests."  <u>See</u> Eckert Decl. at ¶ 10.

Finally, CREW implies that the agency is acting slower than it should because CREW presumes that other requesters must have submitted similar broad requests, in which they asked for all contact records HHS has had concerning public affairs contracts.  However, as explained in the declaration supporting HHS's motion for a stay, one of the exceptions to HHS's "first-in, first-out policy" is if "the request is for materials already reviewed and released for another similar FOIA request and, therefore, readily available."  <u>See</u> Eckert Decl. at ¶ 10.  Therefore, it is already part of the HHS FOIA process to consider whether any material was gathered through another request, such as in response to a Government Accountability Office ("GAO") Report. As the NIH FOIA officer explains, she "asked everyone to use NIH's previous response to a Government Accountability Office's survey about, among other things, public relations firms as a starting point."  <u>See</u> Cornell Decl. at ¶ 4.  However, CREW's request is quite broad and HHS must still respond to each individual request.

HHS has already documented the other ways it has acted with due diligence in responding to CREW's request in its previous brief submitted to this Court.  <u>See</u> Defs. Mem. at 6-9.  This diligence included immediately sending the request to the eleven operating components that may have had responsive documents, having these components gather the documents and start to review them, beginning the processing of the documents after the fee

waiver issue was resolved, producing thousands of pages, and continuing frequent contact

between the HHS central FOIA office and the FOIA offices of the different components.  See id.

CREW's effort to cast aspersions upon the agency's efforts should be rejected.

## II.    HHS Has Shown that Exceptional Circumstances Exist so as to Warrant a Stay

CREW's Opposition brief is sparse with regard to legal citations so it is difficult to

ascertain the legal support for the propositions that they so definitively state.  CREW claims that

HHS is not entitled to a stay because its "workload is entirely predictable and, just as

problematic for the agency stay request, HHS's backlog is increasing, not decreasing, even in the

face of a reduced workload."  See Pl. Opp. at 10.  That, however, is not the standard by which

the Court is to determine whether exceptional circumstances exist.  Rather, such exceptional

circumstances exist when an agency "is deluged with a volume of requests for information vastly

in excess of that anticipated by Congress, when the existing resources are inadequate to deal with

the volume of such requests within the time limits [of the statute], and when the agency can

show that it is 'exercising due diligence' in processing the requests."  See Open Am. v.

Watergate Special Prosecution Force, 547 F.2d at 616.  An agency may show many ways to meet

the standard for exceptional circumstances.  See 1996 U.S.C.C.A.N. 3448, 3467 (agencies can

show exceptional circumstances by demonstrating efforts to reduce its backlog or it could base

exceptional circumstances on the amount of material classified, on the size and complexity of

other requests processed by the agency, on the resources being devoted to the declassification of

classified material of public interest, or on the number of requests for records by courts or

administrative tribunals).  Congress also specified that a requestor's refusal to modify the scope

of its request or to arrange an alternative time frame in processing the request is a factor in

determining if exceptional circumstances exist.  5 U.S.C. §552(a)(6)(C)(iii).  Congress did instruct that the term exceptional circumstances "does not include a delay that results from a predictable agency workload of requests . . ., unless the agency demonstrates reasonable progress in reducing its backlog of pending requests."  See 5 U.S.C. § 552(a)(6)(C)(ii).

HHS has demonstrated that it meets the standard for exceptional circumstances.  First, it has shown that it has been deluged with a great volume of requests and it has had inadequate resources to deal with those requests.  See Defs. Mem. at 10-11.  Second, HHS has shown through several methods that exceptional circumstances exist, including showing that CREW has unreasonably rejected ways to narrow the scope of its request or to agree to an alternative time frame in processing the request, showing that the agency has made great efforts in reducing its backlog, showing that its FOIA office must respond to large and complex requests, showing that the office's resources have been diverted by litigation, and showing that the FOIA office has been able to reduce its backlog when not faced with unpredictable circumstances.  See Defs. Mem. at 11-16.

CREW cites to no authority when it states that "what HHS has not demonstrated is that the nature of FOIA requests it has received has changed over time, a necessary factual predicate to demonstrating exceptional circumstances, rather than a predictable workload."  See Pl. Mem. at 11.  That is because that is not a necessary factual predicate.  Rather, as listed above, there are several ways an agency may demonstrate that exceptional circumstances exists.  The statute is only clear that a predictable workload may not be used as a predicate for a stay.  HHS is not relying on a predictable workload as its basis for a stay.  As explained above, HHS lists many reasons for a stay.

The most obvious reason the agency is entitled to a stay is that CREW has refused to meet the terms of the statute and find a way to work with HHS to avoid the Court's involvement. The FOIA statute is clear: "Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist." 5 U.S.C. §552(a)(6)(C)(iii); see also National Sec. Archive Fund, Inc. v. U.S. Dept. of Air Force, 2006 WL 1030152 at *4 (D.D.C. 2006) ("[a] requester's refusal to reasonably modify the scope of a request or to arrange an alternate time frame after being requested to do so by the agency is a factor in determining whether exceptional circumstances exist"). The facts in this case are also clear. CREW refused to modify the scope of its request after being requested to do so by the agency. CREW rejected alternative time frames for processing its request after the agency put forth such proposals.

CREW's characterization of the FOIA process is incorrect. It is not true that "the agency possesses all the information and the requester is in the dark as to the universe of responsive documents." See Pl. Opp. at 15. CREW, not the agency, is aware of what they are seeking with their FOIA request. They are aware of why they are seeking all contacts and contracts with public affairs firms, even when a contract may entail a public service announcement. Therefore, CREW is in the unique position of being able to narrow the scope of its request. HHS thought of two possible ways for CREW to narrow the scope of its request in a way that would facilitate the processing of the request. The first proposal was for "CREW to identify a list of public affair firms for which they would like to search." See Joint Status Report at 5. CREW rejected this

proposal outright, claiming in their Opposition brief that "CREW can hardly be faulted for being unwilling to narrow the list of firms based on nothing more than guesswork." See Pl Opp. at 16. Therefore the scope of the request remained broad, including many documents in which CREW may have no interest but for which the agency must still identify. As has been explained repeatedly to CREW, "[m]any HHS components do not track contractors by the nature of their business, such as public affairs firms." See Eckert Decl. at ¶ 44. This argument has been ignored by CREW, leaving the agency to nothing more than guesswork in finding what CREW is seeking. It is CREW's prerogative to not narrow the scope of its broad request. The agency can sort through all of its contracts to determine what may include public affairs firms. However, this time-consuming process should factor into whether the agency is entitled to more time to complete the production of documents responsive to CREW's broad request.

The agency also "proposed that CREW may not be interested in any material protected by Exemption 4 of FOIA, which requires pre-disclosure notification." See Joint Status Report at 5 (Docket #24). CREW makes the argument that it could not even respond to this proposal without knowing the different categories of proprietary information. See Pl. Opp. at 16. However, CREW knows what that information would contain. They sought "any contract . . . that any office of the Department of Health and Human Services may have had with any external public affairs firms." See Eckert Declaration, Attachment 1 (CREW's FOIA request). It is clear that the proprietary information would relate to the HHS contracts with external public affairs firms. It is also clear that the information would be that of outside contractors. Again, CREW is in the unique position of knowing what type of information it is seeking. If CREW did not want to include all Exemption 4 material, it could have identified which material in which it had no

interest.  For example, if CREW did not want pricing information, it could so have informed the

agency.  Instead of making a counter-proposal, such as saying that it was not interested in pricing

information, or accepting the agency's proposal, CREW just rejected the offer outright.  Again,

that is CREW's prerogative but it should factor in the amount of time it will take HHS to process

the request.  See Eckert Decl. at ¶ 44 ("[t]he request seeks contracts, among other things, which

sometimes require pre-disclosure notification to the contractors if we determine that there is

information that may be protected by FOIA Exemption 4 and if we are considering releasing that

information.  This can be a very time-consuming process because the submitters of the

information may have objections that the agency needs to evaluate.").

    Besides the offers listed in the Joint Status Report, the agency has proposed another way

to limit the scope of the large number of pages that the NIH has determined as potentially

responsive.  In its declaration submitted with its motion for a stay, the agency stated that NIH

has approximately "1,300 pages" of records for the "approximately 70 contracts/task

orders/purchase orders."  See Ecekrt Declaration at ¶ 39.  However, "[f]or records of contacts

with those 70 or so awards, NIH estimates that it has approximately 500,000 pages of records."

Id.  Therefore, the agency "propose[d] that it would be most efficient if NIH could produce the

awards or Statements of Work first and let the requester choose the ones for which they want

records of contacts."  See id. at ¶ 45 (emphasis added).  CREW's Opposition brief is silent to this

proposal.  Instead, it makes the inaccurate statement that "HHS does not explain what, if any,

time reductions would be achieved by" narrowing the request to not include contact information

for the NIH contracts/task orders/purchase orders.  See Pl. Opp. at n. 5.  The declaration from the

HHS FOIA officer specifically states that he hopes that the narrowing of the request would allow

HHS "to complete processing the NIH records <u>within the requested eight months</u>."  <u>See</u> <u>id.</u> at ¶ 45 (emphasis added).

Besides rejecting the several proposals put forth by HHS to narrow the scope of CREW's request, CREW also rejected two proposals to arrange alternative time frames for HHS to complete production of CREW's request.  Without any support in the record, CREW makes the inaccurate statement that "HHS essentially concedes [that] it did not propose two different schedules."  <u>See</u> Pl. Opp. at 16.  HHS never made such a concession.  HHS explained in its opening brief that both proposals were "variations of a rolling production" and that "both had the first be on November 17, 2006, and the second production on January 26, 2006."  <u>See</u> Defs. Mem. at 13 (citing Joint Status Report at 5).  However, HHS explained that the "difference was the one version called for a status report after the two productions 'to assess the progress HHS is making in processing the request' while the other called for the production of documents 'every 6 weeks' for an anticipated 8 months."  <u>See</u> Defs. Mem. at 13 (quoting Joint Status Report at 5).

The advantages of the first proposal have been realized.  When the Joint Status Report was filed, HHS was still at the very initial stages of determining its response to CREW's request and was only able to give preliminary estimates of the number of potentially responsive documents.  HHS had temporarily suspended processing the request during the fifteen months that the fee waiver issue was in dispute <u>See</u> Eckert Decl. at ¶¶ 31- 37; <u>see also</u> Eckert Decl., Attachment 2 (June 30, 2005, fee waiver denial letter informed CREW that "[s]ince [CREW has] not agreed to pay any processing costs, [its] request has been temporarily suspended, as the search and duplication charges may be substantial").  On September 29, 2006, after this Court had ordered HHS to grant CREW a fee waiver, the Director of the central HHS FOIA office

"sent a memorandum to all of HHS' components requesting that they conduct a thorough search and send to [his] office any documents they deem responsive." See Eckert Decl. at ¶ 36. HHS granted the fee waiver request on October 2, 2006. See id. at ¶ 37. The Joint Status Report was filed October 13, 2006, and at that time, HHS informed the CREW that "the components have identified over 30,000 pages as potentially responsive." See Joint Status Report at 7. Therefore, given this number of pages, HHS anticipated that the "entire process will take 8 months." See id. at 5. HHS is now aware that in addition to the close to 3,000 pages already produced, there are 11,000 to 12,000 pages of potentially responsive documents as opposed to the originally estimated 30,000 pages. See Eckert Supp. Decl. at ¶ 2. Therefore, HHS was able to re-evaluate its original estimate and has proposed to produce all non-NIH documents by April 20, 2007. See id. at ¶ 7. The involvement of the Court could have been avoided if CREW had agreed to a schedule in which HHS is now able to complete production for the non-NIH documents within a few months.

The second proposal stated that HHS would "continue producing the documents every 6 weeks until it is done." See Joint Status Report at 5. This was not open-ended, as CREW claims, because HHS specifically stated that it anticipated completing the process in "8 months." Id. Nevertheless, considering that HHS was at the very initial stages of processing CREW's request after a fifteen month hiatus during the resolution of the fee waiver issue, HHS did not give a date certain in case that date would change. It turned out that it did change. For all non-NIH documents, the estimated date shifted downwards. For the NIH documents, the FOIA director learned "[w]hile preparing his declaration" that NIH had an estimated 70 contracts/task orders/purchase order that have approximately 500,000 pages of adjoining contact records. See

Eckert Decl. at ¶ 39. Therefore, it was necessary to create a separate date for those documents. Still, HHS never proposed waiting to produce the non-NIH documents until the NIH documents were completed. Instead, HHS proposed producing documents every 6 weeks so as not to delay CREW's receipt of responsive documents.

Besides CREW's refusal to compromise, HHS has demonstrated other matters that have contributed to the exceptional circumstances that warrant a stay. Namely, HHS has acted with great diligence in its efforts to reduce its backlog, a factor to consider if exceptional circumstances exist. See Defs Mem. at 10, 14-15 (citing 1996 U.S.C.C.A.N. 3448, 3467 and The Wilderness Society v. United States Dept. of the Interior, 2005 WL 3276256 at *6 (D.D.C. 2005)). CREW claims that the agency's efforts to improve the way it processes FOIA requests "is severely undermined by its choice to divert important FOIA resources away from processing FOIA requests, as the statute commands, to more discretionary tasks." See Pl Opp. at 7. However, those "discretionary tasks," such as re-designing the HHS FOIA web site to have more information available to requesters and finding ways to improve its timely responsiveness with a FOIA Improvement Plan, will actually facilitate the faster processing of FOIA requests. See Eckert Decl. at ¶¶ 21, 24, 41. The Improvement Plan has already had a positive effect, with the addition of a new FOIA analyst. See Eckert Decl. at ¶ 21 ("the assessment of staffing requirements assisted in supporting the increase in the number of analysts"). In fact, CREW laments that when it made its request in 2005, HHS did not employ the same methods that it derived in 2006 in its FOIA Improvement Plan. See id. at 14. CREW tries to put the agency in a Catch-22 in which any effort to create a system to reduce the backlog is in the end preventing the agency from acting in due diligence in responding to the initial request. CREW views its own

request in a vacuum, where any resources that are not spent in processing CREW's request are resources wasted, even if those resources are being used to process other requests or to improve methods HHS uses in processing future FOIA requests.

CREW is also dismissive of the other factors a Court is to look at in determining whether exceptional circumstances exist. The agency demonstrated that the requests that the central HHS FOIA office has had to deal with are complex and that its resources have been diverted by litigation. See Defs. Mem. at 13-14. These are both elements a Court is to consider in determining exceptional circumstances. See 1996 U.S.C.C.A.N. 3448, 3467. CREW conflates the questions of complex requests and whether there have been resources devoted to litigation with whether the workload is predictable. See Pl. Mem. at 10-11. However, Congress made it clear that those are two separate questions. See 1996 U.S.C.C.A.N. 3448, 3467. ("1996 amendments clarify that routine, predictable agency backlogs for FOIA requests do not constitute exceptional circumstances for purposes of the act. . . . Agencies may also make a showing of exceptional circumstances . . . based upon the size and complexity of other requests processed by the agency . . . or based upon the number of requests for records by courts or administrative tribunals") (emphasis added). The existence of complex requests and litigation diverting resources are by their very nature not routine. That is why Congress made it clear that a Court should consider both in determining whether exceptional circumstances exist.

Finally, CREW ignores the unpredictable elements that have contributed to HHS's backlog and that, when circumstances were predictable, HHS did make reasonable progress in reducing its backlog. Specifically, HHS has explained that it did reduce its backlog in 2001 and 2002. See Defs Mem at 15 (citing Eckert Decl. at ¶¶ 13, 14). In 2003, it rose but due mainly

due to the unpredictable circumstance of the Director being absent due to the illness and death of his wife. <u>See</u> Defs Mem at 15-16 (citing Eckert Decl. at ¶ 15). This is highly relevant to the question of whether the workload, given the available resources, has been predictable. <u>Contra</u> Pl. Mem. at 12 (claiming that the Director's absence in 2003 has no bearing on how HHS is currently processing its request). When a backlog increases due to unpredictable reasons in one year, it has an effect on future years because then the agency has to deal with the requests within the backlog in addition to the new incoming requests. In 2004, the agency has demonstrated that the number of requests unpredictably increased and, therefore, the backlog increased even though the agency processed more requests than in any of each of the previous three years. <u>See</u> Defs Mem at 16 (citing Eckert Decl. at ¶¶ 13-16). Finally, in 2005 and 2006, the backlog increased but that is due to both a long-term vacancy that the FOIA Director sought to fill (and finally did) and to resources being devoted to litigation and the long-term improvement of HHS's ability to respond to FOIA requests. <u>See</u> Defs Mem at 16 (citing Eckert Decl. at ¶¶ 17-18, 21-22). Nevertheless, reasonable progress "does not require that annual backlog reductions be uniform." <u>See</u> <u>Appleton</u>, 254 F. Supp. 2d at 10 n.4 (finding an increase of 971 requests in the backlog not to be problematic). In any event, the pull on the resources in 2005 and 2006 demonstrates that the agency has had inadequate resources to respond to the FOIA requests, a necessary condition to warrant a stay. <u>See</u> <u>Open Am.</u>, 547 F.2d at 616. The agency should also not be penalized by making efforts to improve its long-term ability to meet its FOIA demands, which would therefore reduce the backlog and which is something a Court is to consider in determining whether exceptional circumstances exist. <u>See</u> Defs Mem. at 10, 14-15 (citing 1996 U.S.C.C.A.N. 3448, 3467 and <u>The Wilderness Society v. United States Dept. of the Interior</u>,

2005 WL 3276256 at *6 (D.D.C. 2005)).

HHS meets the standards for a stay.  HHS is now seeking a stay that it is fewer than three months from January 26, 2007, to April 20, 2007, for all non-NIH documents after it was able to re-evaluate its processing of CREW's request.  <u>See</u> Eckert Supp. Decl; <u>see</u> <u>also</u> Defs. Mem at 17 (explaining the need for the time requested to process CREW's broad request).  Furthermore, HHS has now supplemented its previous declarations with even more detail of why it is necessary for HHS to have a stay until January 26, 2010, to complete production of the NIH documents.  <u>See</u> Cornell Decl.; <u>see</u> <u>also</u> Defs. Mem at 17.

## **CONCLUSION**

For the reasons set forth above, this Court should grant Defendant's Motion for a Stay of Proceedings.

Dated December 8, 2006

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
(D.C. Bar 418925)
Assistant Branch Director
U.S. Department of Justice
Civil Division, Federal Programs Branch

/s/ *Adam D Kirschner*
ADAM D. KIRSCHNER
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
Mailing Address
P.O. Box 883
Washington, D.C., 20044
Delivery Address
20 Massachusetts Ave., NW., Room 7126
Washington, D.C. 20001
Telephone: (202) 353-9265
Fax: (202) 616-8470
adam.kirschner@usdoj.gov

Counsel for Defendant